[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 96-2827
_____

D. C. Docket No. 95-03089-30/RV

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JEFFERY JEROME TOLER, DUANE ROSHELL,
JOHN THOMAS WILLIAMS, REUBEN
BERNARD AVERHART, VICTOR MOORER,
KEITH COLEMAN, CHRISTOPHER GULLEY,
URSULA STRONG, TRACI MATHIS, MELODY
DIANNE FONTENOT,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Florida

_____

**(June 30, 1998)**

Before BLACK and BARKETT, Circuit Judges, and HENDERSON, Senior Circuit Judge.

BARKETT, Circuit Judge:

Ten appellants -- Reuben Averhart, Keith Coleman, Melody Fontenot, Christopher

Gulley, Traci Mathis, Victor Moorer, Duane Roshell, Ursula Strong, Jeffrey Jerome Toler, and

John Williams -- appeal their convictions for conspiracy to possess with intent to distribute

cocaine and cocaine base.[1] We find no reversible error in the numerous claims raised by appellants Averhart, Coleman, Fontenot, Gulley, Moorer, Roshell, Toler, and Williams and, therefore, affirm their convictions without further discussion. See 11th Cir. Rule 36-1.[2] As Traci Mathis and Ursula Strong's challenges to the sufficiency of the evidence supporting their convictions for conspiracy present more difficult cases, we address their claims in greater detail below. For the reasons that follow, we affirm Strong's conviction but reverse Mathis' conviction.

## I. DISCUSSION

"Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act." Ianelli v. United States, 420 U.S. 770, 777 (1975). The agreement is the "essential evil at which the crime of conspiracy is directed," and "agreement remains the essential element of the crime." Id. at 777 n.10.

We note that in some instances, our caselaw has used a shorthand analytic template: a three-prong test which asks whether "(1) an agreement existed among two or more persons; (2) ... the defendant knew of the general purpose of the agreement; and (3) ... the defendant knowingly and voluntarily participated in the agreement." United States v. High, 117 F.3d 464, 468 (11th Cir. 1997).[3] Approaching the offense of conspiracy in this fashion may be helpful in

---

[1] Melody Fontenot was also convicted of one substantive count of possession with intent to distribute cocaine and cocaine base.

[2] They allege, in various combinations, that their convictions should be vacated based on: (1) fatal variance, (2) juror misconduct, (3) violation of Batson v. Kentucky, (4) omission of a buyer-seller jury instruction, (5) sufficiency of the evidence, (6) prosecutorial misconduct, and (7) prejudicial joinder. Several appellants also challenges their sentences.

[3] This test seems to have its origin in this circuit in Causey v. United States, 352 F.2d 203, 207 (5th Cir. 1965). Sometimes the test is recited differently, and, in somewhat circular

multi-defendant conspiracy cases -- where there exists an initial core group of conspirators and the government seeks to link peripheral players' subsequent joinder in the scheme -- but it is somewhat redundant and incomplete. It is axiomatic that the existence of an agreement necessarily implies knowledge of the object of the agreement and the voluntary expression of assent to participate in its objectives. Moreover, the second and third "prongs" of the test really speak to the type of evidence that might be used to infer the defendant's agreement, that is, evidence of the defendant's knowledge of the alleged scheme and evidence of the defendant's participation in the scheme. Additionally, the test does not mention the essential element of a conspiracy that the object of the agreement must be illegal.

Thus, the elements of the offense of conspiracy under 21 U.S.C. § 846 are: (1) an agreement between the defendant and one or more persons, (2) the object of which is to do either an unlawful act or a lawful act by unlawful means. See United States v. Parrado, 911 F.2d 1567, 1570 (11th Cir. 1990) ("To support a conspiracy conviction under 21 U.S.C. § 846, the government must prove that there is an agreement by two or more persons to violate the narcotics laws."); 2 Wayne R. La Fave & Austin W. Scott, Jr., Substantive Criminal Law § 6.4 at

fashion, uses the term "conspiracy" to define the components of a conspiracy. See, e.g., United States v. Calderon, 127 F.3d 1314, 1326 (11th Cir. 1997) (requiring proof that "(1) a conspiracy existed; (2) appellants knew of the essential objectives of the conspiracy; and (3) appellants knowingly and voluntarily participated in the conspiracy"); United States v. Mejia, 97 F.3d 1391, 1392 (11th Cir. 1996) (same), cert. denied, ___ U.S. ___, 117 S. Ct. 1016 (1997); United States v. Kelly, 888 F.2d 732, 740 (11th Cir. 1989) (same). However, it is clear that this formulation employs the term "conspiracy" interchangeably with "agreement" and is not meant to efface the centrality of the agreement element of conspiracy.

This tripartite formulation has become so commonplace that we have, on occasion, lapsed into misbranding its three prongs "elements" of the crime of conspiracy. See, e.g., United States v. Harris, 20 F.3d 445, 452 (11th Cir. 1994); United States v. Hernandez, 896 F.2d 513, 518 (11th Cir. 1990); United States v. Vera, 701 F.2d 1349, 1357 (11th Cir. 1983); United States v. Malatesta, 590 F.2d 1379, 1381 (5th Cir. 1979) (en banc).

3

60 (1986).

Because the crime of conspiracy is "predominantly mental in composition," United States v. Shabani, 513 U.S. 10, 16 (1994), it is frequently necessary to resort to circumstantial evidence to prove its elements. Glasser v. United States, 315 U.S. 60, 80 (1942) ("Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and collocation of circumstances.'"); United States v. Gold, 743 F.2d 800, 824 (11th Cir. 1984) ("'The very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme.'") (quoting United States v. Ayala, 643 F.2d 244, 248 (5th Cir. Unit A 1981)) (brackets omitted). Consequently, the government need not demonstrate the existence of a "formal agreement," Gold, 743 F.2d at 824, but may instead demonstrate by circumstantial evidence "'a meeting of the minds to commit an unlawful act.'" United States v. Awan, 966 F.2d 1415, 1434 (11th Cir. 1992) (quoting United States v. Parker, 839 F.2d 1473, 1478 (11th Cir. 1988)).[4]

---

[4] It is this requirement of an agreement to participate in a criminal scheme that distinguishes conspiracy from the related offense, aiding and abetting. See Ianelli, 420 U.S. at 777 n.10 (noting that "agreement remains the essential element of the crime [of conspiracy], and serves to distinguish conspiracy from aiding and abetting which, although often based on agreement, does not require proof of that fact"). As we have explained in the past,

> [t]he essence of conspiracy is proof of a conspiratorial agreement while aiding and abetting requires there be a "community of unlawful intent" between the aider and abettor and the principal. While a community of unlawful intent is similar to an agreement, it is not the same. Thus, a defendant may wittingly aid a criminal act and be liable as an aider and abettor, but not be liable for conspiracy, which requires knowledge of and voluntary participation in an agreement to do an illegal act.

United States v. Bright, 630 F.2d 804, 813 (5th Cir. 1980) (citation omitted).

4

In addition, the government must prove the conspiracy it charged in the indictment rather than some other conspiracy. The government must show an "interdependence" among the alleged co-conspirators in order to prove that the indicted conspiracy was a single unified conspiracy as opposed to a series of smaller, uncoordinated conspiracies. United States v. Coy, 19 F.3d 629, 634 (11th Cir. 1994) (citing United States v. Harrison, 942 F.2d 751, 756-57 (10th Cir. 1991)).

Moreover, the government's proof must be beyond reasonable doubt. This means that "when the sufficiency of the evidence to support any criminal conviction, including conspiracies, is challenged on appeal, the correct standard of review is substantial evidence ... viewed in the light most favorable to the government." United States v. Malatesta, 590 F.2d 1379, 1382 (5th Cir. 1979) (en banc) (emphasis in original).[5] In Malatesta, our en banc Court addressed the misperception from prior caselaw that the government only needed "slight evidence" to support a conspiracy conviction:

> The "slight evidence" rule as used and applied on appeal in conspiracy cases since 1969 should not have been allowed to worm its way into the jurisprudence of the Fifth Circuit. It is accordingly banished as to all appeals hereafter to be decided by this Court.

Id. (emphasis in original).

After Malatesta, several panels have again used the term "slight evidence" in conspiracy cases. See United States v. Calderon, 127 F.3d 1314, 1324, 1326 (11th Cir. 1997) (stating that "'once the government establishes the existence of the underlying conspiracy, it only needs to

---

[5] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

come forward with slight evidence to connect a particular defendant to the conspiracy'" but also that a reasonable guilty verdict must stand "if there is substantial evidence to support it") (quoting United States v. Harris, 20 F.3d 445, 452 (11th Cir. 1994)) (brackets omitted); United States v. Gates, 967 F.2d 497, 499 (11th Cir. 1992) (stating that "[o]nce the existence of a conspiracy is established, only slight evidence is necessary to connect a particular defendant to the conspiracy" while recognizing that "[t]he evidence is sufficient when there is substantial evidence to support the conviction"); United States v. Clavis, 956 F.2d 1079, 1085 (11th Cir. 1992) (stating that "[o]nce the existence of a conspiracy is established, only slight evidence is necessary to connect a particular defendant to the conspiracy"), modified, 977 F.2d 538, 539 (11th Cir. 1992); United States v. Orr, 825 F.2d 1537, 1542 (11th Cir. 1987) (same). However, in Clavis, the panel later withdrew the reference to the "slight evidence" standard, recognizing that it is inconsistent with the dictate in Malatesta that there must be "'substantial evidence' connecting an appellant to a conspiracy." United States v. Clavis, 977 F.2d 538, 539 (11th Cir. 1992) (quoting United States v. Bulman, 667 F.2d 1374, 1377 (11th Cir. 1982) (in turn interpreting Malatesta)).[6]

To the extent that the phrase "slight evidence" suggests that a conviction can be obtained by less than evidence of guilt beyond a reasonable doubt, as recognized in Malatesta, that would be contrary to the long-established principle of due process that all criminal convictions must be proved by "evidence necessary to convince a trier of fact beyond a reasonable doubt of the

---

[6] A new outgrowth of the "slight evidence" standard is the proposition that the evidence necessary to link a defendant to a conspiracy is "a 'minimal threshold' that may be passed on either direct or circumstantial evidence." Calderon, 127 F.3d at 1326 (quoting Harris, 20 F.3d at 452).

existence of every element of the offense," <u>Jackson v. Virginia</u>, 443 U.S. 307, 316 (1979). <u>See</u> <u>also</u> <u>In re Winship</u>, 397 U.S. 358, 364 (1970) (holding that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged").[7] Thus, to be constitutional, the phrase "slight evidence" must be interpreted to refer not to the quantum of evidence necessary to support a conspiracy conviction but, instead, to the extent of a defendant's connection to the conspiracy or to the other conspirators. That is to say, for example, that notwithstanding that there may be a large number of co-conspirators, a defendant's guilt can be established if his or her contact extends to only a few or even one of the co-conspirators so long as the agreement, with its concomitant knowledge of the general scope and purpose of the conspiracy and the defendant's intent to participate in achieving its illegal ends, is proven beyond a reasonable doubt. Likewise, a defendant can be convicted even if his or her participation in the scheme is "slight" by comparison to the actions of other co-conspirators. In other words, as with all criminal charges, each element of a conspiracy must also be proven as to each defendant beyond a reasonable doubt; the law simply recognizes that all co-conspirators need not play identical roles in perpetuating the unlawful agreement.

Thus, in reviewing a conviction for sufficiency of the evidence, we examine the evidence

_____

[7] Other courts have also cautioned against the misuse of the use of the phrase "slight evidence" in conspiracy cases. <u>See</u> <u>United States v. Burgos</u>, 94 F.3d 849, 861-62 (4th Cir. 1996) (en banc), <u>cert. denied</u>, ___ U.S. ___, 117 S. Ct. 1087 (1997); <u>United States v. Durrive</u>, 902 F.2d 1221, 1225-29 (7th Cir. 1990); <u>United States v. Marsh</u>, 747 F.2d 7, 12-13 (1st Cir. 1984); <u>United States v. Dunn</u>, 564 F.2d 348, 357 (9th Cir. 1977); <u>see also</u> Jon O. Newman, <u>Beyond "Reasonable Doubt"</u>, 68 N.Y.U. L. Rev. 979, 994-95 (1993); Note, <u>Connecting Defendants to Conspiracies: The Slight Evidence Rule and the Federal Courts</u>, 64 Va. L. Rev. 881, 893-95 (1978).

de novo in the light most favorable to the government, to determine whether a reasonable jury could have concluded beyond a reasonable doubt that the defendant was guilty of the crimes charged. United States v. Lopez-Ramirez, 68 F.3d 438, 440 (11th Cir. 1995). A verdict of guilty must stand if there is substantial evidence to support it "unless no trier of fact could have found guilt beyond a reasonable doubt." United States v. Lyons, 53 F.3d 1198, 1202 (11th Cir. 1995).

## A. The Conspiracy in This Case

The proven conspiracy in this case involved the purchase of cocaine by five Pensacola men and several assistants from primary suppliers in Miami and Texas and the conversion of that cocaine into cocaine base ("crack") for the ultimate purpose of distributing crack on the streets of Pensacola through a loosely organized network of lower level buyer-sellers. Rod Savage, a co-defendant who pled guilty before trial, was a central figure in the conspiracy, along with his friends Marcus McCall, Anthony McCall, and Marcus Clark, among others. The government's theory of Ursula Strong and Traci Mathis' involvement in the conspiracy was that Strong, Savage's live-in girlfriend, assisted Savage's drug activities in various ways, including moving cash hidden in their apartment to another location at his request, and that Mathis permitted Savage to use her apartment as a place to cook and store crack.

## B. Ursula Strong

At the time of trial, Ursula Strong was a nineteen-year-old high school graduate studying at a local junior college to become a registered nurse. R17:2524-25. Strong met Rod Savage in 1993, when she was seventeen. Savage was twenty-three at the time. Savage and Strong began dating and eventually became engaged. Id. at 2526. In April 1995, they began living together in an apartment across the street from the junior college Strong was attending. Id. at 2525-26. The

8

indictment charged that she conspired with Savage and others during this time to possess crack cocaine with the intent to distribute it.

To prove its case against Strong, the government presented the testimony of two witnesses, several documents, and over a dozen intercepted telephone conversations,[8] primarily between Strong and Savage. Viewed in the light most favorable to the government, the evidence reflected the following. In one conversation Savage called Strong at home to tell her to get all of the "trash" in the apartment from a series of hidden places and to take it to her mother's house. Ex. 63-B-T. During her testimony, Strong explained that "trash" referred to money. R17:2552. In the conversation, when she asked Savage why he wanted her to do this, he responded that he had "a bad feeling" and that there were some "crackers" around him all morning. Ex. 63-B-T. Marcus Clark, an indicted co-conspirator, testified that "crackers" referred to police. R15:1820. Strong presumably did as Savage instructed because an agent posted outside her residence saw her leave with two bags shortly after the call. R7:43-44.

Several hours later, Savage called Strong and indicated that the reason he told her to "get that stuff" to her mother's house was that he had been busy all day seeing various people about "business" and that he did not "feel right" after having seen certain people "riding" by the park. Ex. 63-C-T. Other testimony at trial established that most of the drugs Savage distributed were sold near a Pensacola park. The jury thus could have inferred that Savage was in fact referring to his fear that he or his co-conspirators might get caught dealing drugs by police patrolling the park area. At trial, Strong explained that she thought by "crackers" Savage meant white people, and that if Savage was so scared by seeing certain white people that he wanted her to take all of

---

[8] We do not recount all of these conversations here.

9

their money from their apartment and move it to her mother's house, she would "just do what he told me to." R17:2578-79.

Another phone call, almost identical to the first one, but nearly a month later, seems to have involved a similar situation. Ex. 65-A-T. In this call, Savage appears to have been in an agitated state. He asked Strong for someone's phone number and instructed her to get money from underneath some shirts in his closet, inside his tennis shoe, behind his baby picture in the living room, and under a lamp, and said, "and you know what to do with it."

In another conversation, Strong reported to Savage that while she was at the beauty salon frequented by co-defendant Marcus McCall's wife, someone asked Strong if the rumor was true that Savage was a "big drug dealer." Ex. 58-A-T; R17:2589. Strong explained that she told the woman to mind her own business. Savage responded that gossip like that upset him, and Strong agreed, saying that she was worried that her aunt and mother might find out. At the end of the conversation, Savage told Strong that he had warned her to "stay out of the damn hair shops" because the women there "run[] their ... mouths." Strong concurred, adding that she would have to be "crazy" to be "in there talking."

On another occasion, Strong was recorded commiserating with a girlfriend about not receiving enough money from their boyfriends. Ex. 43-B-T. After noting that her friends Makita and Tanya, who was the girlfriend of one of the McCall brothers,[9] had the same problem, Strong complained that their boyfriends should collect what was owed them and boasted that she

---

[9] It is unclear whether Tanya was Marcus McCall's girlfriend or his brother Anthony McCall's girlfriend. Compare R14:1686-87 (testimony of Calvin Avery) with R17:2591-92 (testimony of Ursula Strong). However, both McCalls were participants in the conspiracy and pled guilty to the charge.

10

would not be scared to confront people who owed money, agreeing with her girlfriend that they should "hurt 'em some" to show that they had better pay.  Ex. 43-B-T.  On another occasion, in the midst of an argument with Savage about their relationship, Strong said that she was "risking" herself for him because she was "in the midst of all this" and that he wanted her to be on his side whenever anything "go[es] down."  Ex. 111-A-T at 5.

In a conversation with another co-conspirator, Marcus Clark, Strong responded in the affirmative to Clark's inquiry regarding whether the Lemox Book Store sold "chemistry stuff" and gave him directions as to its location.  Ex. 64-A-T.  Finally, in a conversation recorded between Savage and Clark, Savage asked Strong to "put the chain on that door" while Savage proceeded to talk to Clark about some "garbage" or "thing" Savage had in a bowl.  Ex. 59-A-T.

Cooperating witness Calvin Avery, a convicted drug dealer, testified that on one occasion when Strong came over to his apartment with the McCall brothers' wife and girlfriend for a party and he went upstairs to make a drug sale on two or three occasions, Strong told him that he did not have to hide what he was doing from her because her "old man does the same thing, sells dope."  Id. at R14:1668, 1683-89.  Strong denied saying this.

The government also introduced documentary evidence against Strong.  Strong's address book contained some notations of numbers and letters in one location, but Strong denied writing them or knowing what they meant.  R17:2538-39.  The government contended in its closing argument that these notations were "count figures of cash"  R19:3267.  The government also introduced the titles and other documents pertaining to several automobiles and a motorcycle that Savage used.  See id. at 2532-33.  The titles were held in the names of various people, including Ursula Strong's.  Id. at 2607.  Strong testified that she did not know Savage placed the

11

motorcycle in her name.  Id. at 2537.

Strong maintained at trial, and reiterates now, that she had no idea Savage was a drug dealer.  According to her testimony, she thought he earned a living making mailboxes with his father.  While Strong's version of events finds some support in the testimony of Marcus Clark and Eric Savage that Rod Savage went to great lengths to shelter Strong from the truth, see R15:1854; R16:2011, the jury was entitled to disbelieve their testimony and Strong's explanations in light of other evidence that could support the opposite conclusion.

We conclude that the record, viewed in the light most favorable to the government, contains sufficient evidence from which the jury could find beyond a reasonable doubt that Strong agreed to participate with Savage and his co-conspirators, albeit in a minor way, in the sale of crack cocaine.  Her conviction is, therefore, affirmed.

C.     Traci Mathis

Unlike the evidence against Strong, a detailed review of the evidence presented against Traci Mathis, even when viewed in the light most favorable to the government, fails to show beyond a reasonable doubt that Mathis agreed to participate in a conspiracy to possess and distribute crack cocaine.

The evidence at trial revealed the following.  Mathis is a certified nurse's aide and the single mother of a young girl. Although Mathis rented an apartment on Guidy Lane in Pensacola, R18:2695-96, she and her daughter spent most of their time at Mathis' mother's house on Aaron Drive because Mathis relied on her mother to help care for her daughter and because Mathis was afraid to live alone.  Id. at 2698-99.

Mathis gave the following uncontradicted testimony about her relationship with Rod

12

Savage. Mathis' brother, Larry, introduced her to Savage in 1987. R18:2700. Although Mathis and Savage dated briefly in June 1994, they did not develop a romantic relationship. Id. Until Larry Mathis got married in April 1995, Savage was in the habit of dropping by the Mathis residence at Aaron Drive. Id. at 2703. However, after Larry got married, Savage stopped visiting, and Mathis did not see Savage from April until October 1995, when Savage showed up at the Aaron Drive residence and asked Mathis if he could stay in her apartment for a few days because he had had a fight with his girlfriend. R18:2703-04, 2669-70. Mathis acceded to his request and gave him a key, but told him not to turn on her television or have any guests over and to pay her electricity bill and turn off her central air and heat when he left. Id. at 2704. Mathis thought Savage would stay there for two or three days, but after that time passed, Savage did not return the key. Id. On November 3, Mathis encountered Savage and asked him for the key back, but he claimed that he had lost it. Id. at 2707. Consequently, she had the locks to her apartment changed the following day. Id.

The bulk of the government's evidence against Mathis consisted of five intercepted conversations between her and Savage, all initiated by Savage, which took place between November 22 and December 9, 1995. In the first call, on November 22, Savage asked Mathis why she changed the lock on the door to her apartment and told her that he needed to get "something" out of the apartment. Ex. 42-B-T at 9. Mathis asked Savage: "What you got in there?" When Savage responded, "some bowls," Mathis, obviously angry, repeated three times that he was not getting them. Id. Mathis then expressed anger at Savage for bringing someone who was "hot" over to her apartment. Id. at 9-10. Mathis also told Savage to pay the electricity bill (of about $50.00), and that once he did, she would let him come to the apartment to pick up

13

his "stuff." Id. at 11.  She added that she did not trust him anymore.  Id.  Mathis also complained that he had messed up her silverware and kitchen furniture.  Id. at 12.

At trial, Mathis testified that the "hot" person to whom she referred in this conversation was Marcus McCall, whom she knew was a drug dealer.  R18:2707.  She said that she suspected that McCall had been in her apartment because one day when she was driving home from work, she observed Savage and McCall driving on Guidy Lane.  Id. at 2704-05.

Savage called Mathis back less than twenty minutes after the first call.  Ex. 42-C-T.  He requested that she give him a key to the new locks.  Id. at 14.  She adamantly refused, adding that he was "always tryin[g] to use [her]."  Id.  In the third call, on November 24, Savage called Mathis at her apartment.  Ex. 43-A-T.  Mathis informed him that she was over there and that he could "come get [his] bowls."   He asked her if the bowls had a thick blue ring around them, and she confirmed that they did.  Id.

Mathis testified that on December 6, she went back to her apartment with her friend Dwight Anderson.  They encountered Savage in the apartment.[10]  Savage explained that he was looking for something of his that he left in the bedroom.  R18:2725.  Both Mathis and Anderson testified that they observed him go over to the refrigerator/freezer and count something inside before he left.  R18:2685-86, 2725.

The fourth call occurred the next day, December 7.  Ex. 52-A-T.  Savage called Mathis at her mother's house in the early afternoon and told Mathis that he was missing one of those "th[i]ngs."  Id. at 1.  She responded that he would not get it back until he brought her "five hundred dollars."  Id.  After confirming that she only had one "thing," Savage inquired whether

---

[10]  It is unclear how Savage gained access to the apartment.

she had "mess[ed] with the rest of it." Mathis responded, "Rest of what?" and then explained that she had gotten "so mad with [him]" the night before that she went to her apartment and took "one and brought it" to her mother's house. Id. at 2. When Savage said he would come by to retrieve it, she reiterated, "You better bring my five hundred dollars." Id. Mathis testified that her threat was merely a bluff designed to get Savage to pay her something because she wanted him to make good on his earlier promise to buy her daughter a VCR for Christmas. R18:2728.[11] The dollar amount she chose, she said, was random. Id.

Five hours later, Savage called Mathis to complain that he was afraid that her cousin, who Savage evidently thought had overheard something Mathis said, was going to be spreading word that Savage is "sellin[g]." Ex. 62-A-T. Mathis told him not to worry about her cousin. Id. Savage then accused Mathis of taking "something" that belonged to him. Mathis disagreed with him and asked him why he was treating her this way. Id. The conversation then shifted to other subjects.

The final call, on December 9, 1995, was not transcribed. R18:2972; Gov. Br. at 28 (quoting Ex. TM-114). Savage told Mathis that there were three bags in the refrigerator, but Mathis maintained that she only saw two. Id. She told him that he knew she did not take "that shit" and added, "What am I going to do with it?" Id. He repeated that there were "three in the bag," and she replied that there were only "two." Id.

---

[11] Traci's sister, Debra Mathis, testified to having heard Traci and Savage discuss this VCR on several occasions. R18:2674-75. She also testified that she was present in the apartment on December 9, 1995 when Traci and Savage had the phone conversation in which Traci told him to pay her $500. Id. at 2682. Debra Mathis believed that Traci was referring to money for the purchase of a VCR. Id. at 2683. Dwight Anderson also testified that he was present during a conversation between Traci and Savage sometime in November 1995 in which Traci asked Savage whether he was still going to buy her daughter a VCR for Christmas. Id. at 2687, 2693.

In addition to playing recordings of these intercepted calls, the government also introduced the testimony of co-defendants Marcus McCall and Leroy Coleman. Rod Savage was never called to testify. McCall testified that he accompanied Savage to Mathis' apartment on one occasion in 1995 in order to cook four ounces of cocaine into crack. R14:1601.[12] However, McCall also testified that Mathis was not present at the apartment during any of the twenty minutes or so that they were there and that he and Savage themselves brought bowls, beakers, and baking soda with them to accomplish the task. Id. at 1601-03, 1613.

Leroy Coleman testified that he accompanied Savage to Mathis' apartment on approximately five occasions "sometime between June and November" 1995 to "check on cocaine" but that Mathis was never present. Id. at 1618-20.[13] He said that he actually went inside the apartment on only two occasions. Id. at 1618. Coleman testified that in November 1995, Mathis told him to tell Savage that Savage could no longer store his "stuff" at her apartment. Id. at 1621, 1650. He testified that Mathis told him to tell Savage that if Savage did not pay her she would change the locks to the apartment. Id. at 1621-22. Coleman then offered his opinion that Mathis was mad because Savage had not paid her any money for storing cocaine. Id. However, during cross-examination Coleman acknowledged that he had no facts upon which to base this opinion. Id. at 1650-51.

Viewing this evidence in the light most favorable to the conviction, as we must, it does

---

[12] McCall initially testified that this event occurred in the "early part of [19]95," R14:1604, but later admitted on cross-examination that it could have happened in the later part of 1995 as well. Id. at 1614.

[13] Although Coleman testified on direct examination that he went to Mathis' apartment on five occasions for the purpose of checking on cocaine, it is unclear from his responses to questions on cross-examination whether some of those visits involved social gatherings rather than drug business. See R14:1649, 1663.

not demonstrate beyond a reasonable doubt that Mathis agreed with Savage to let him manufacture and store crack cocaine in her apartment. In fact, the evidence at trial completely belied any assertion that Mathis agreed to facilitate the ends of the conspiracy. Mathis gave Savage a key to her apartment some time in late October. When Savage refused to return the key on November 3, she had the locks changed the next day. The only way that Mathis' locking Savage out of her apartment could be construed as consistent with an ongoing agreement between the two of them is if Mathis acted in an attempt to force Savage to comply with his end of some bargain which he had not kept. The only evidence that might conceivably support this inference is Leroy Coleman's testimony that Mathis "was mad because Rod hadn't g[iven] her any money for storing cocaine over there." R14:1621. As we have indicated, this testimony represented Coleman's gloss on Mathis' reported statement that she was going to change the locks on her apartment unless Savage paid her and removed his "stuff." However, there is no factual basis for Coleman's opinion because, as Coleman admitted, Mathis never said anything about drugs in their conversation, id. at 1650-51, and there is no evidence that she knew, prior to the time she changed the locks, that Savage kept cocaine in her apartment. Coleman, on the other hand, had seen drugs at Mathis' apartment while there with Savage to "check on cocaine," but, as he admitted, Mathis was never present on any of those occasions. Moreover, as the electronic surveillance evidence suggests, the payment Mathis mentioned may have been for the electricity bill she claimed Savage had agreed to pay. See Ex. 42-B-T. Coleman's opinion testimony is also inconsistent with Mathis' conduct captured in the government's recordings. If Mathis were indeed interested in securing payment for allowing Savage to store drugs in her apartment, one would not expect her to permit Savage to retrieve his belongings without paying her. However, after initially telling Savage that he could not retrieve his "stuff" until he paid her

17

electricity bill, Mathis eventually invited Savage to come to her apartment to retrieve his "bowls" without any demand for payment. See Ex. 43-A-T. It was not until two weeks later, when Mathis encountered Savage in her apartment and he accused her, the following day, of taking one of his "things," that she demanded $500 in exchange for its return. In sum, Coleman's testimony alone is insufficient to support the inference that Mathis changed the locks to force compliance with a preexisting agreement because his testimony lacks a factual foundation and is at odds with the government's electronic surveillance evidence.

The government's case against Mathis, then, depends entirely upon her demand that Savage pay her $500 for the "thing" she took from the refrigerator. Viewing the evidence in the light most favorable to the government, we assume that the "thing" she took was cocaine. The government took the position at trial that Mathis' act of ransoming the cocaine evidenced, "in and of itself," a prior agreement by which Savage would pay Mathis for the use of her apartment. R19:3261, 3265.

We cannot conclude that the government's inferential leap suffices to cross the chasm of proof beyond a reasonable doubt that Mathis agreed to join the conspiracy. Although Mathis' action might support a conviction for criminal blackmail, unlawful possession of drugs, or another criminal act, it could hardly be termed to be an act in furtherance of Savage's conspiracy. In fact, it would be directly at odds with Savage's conspiracy. Indeed, even where the act in question appears to further the objective of a conspiracy, not every such act provides a sufficient basis to demonstrate the actor's concurrence in the agreement. As the Supreme Court explained in a case involving the illegal sale of prescription drugs, "one does not become a party to a conspiracy by aiding and abetting it, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally."

18

Direct Sales Co. v. United States, 319 U.S. 703, 709 (1943). The same holds true where the goods sold are illegal narcotics; "'the existence of a simple buyer-seller relationship alone does not furnish the requisite evidence of a conspiratorial agreement.'" United States v. Brown, 872 F.2d 385, 391 (11th Cir. 1989) (quoting United States v. Bascaro, 742 F.2d 1335, 1359 (11th Cir. 1984)); United States v. Solomon, 686 F.2d 863, 877 (11th Cir. 1982). Assuming for the purpose of discussion that Mathis knew of the essence of Savage's conspiracy to distribute drugs, the government would still have had to show that Mathis affirmatively agreed to participate in that scheme. See Direct Sales Co., 319 U.S. at 713 (permitting the inferential "step from knowledge to intent and agreement" where the government had proven "more than knowledge"). This the government has not done in this case.

Although the evidence need not exclude every reasonable hypothesis of innocence in order to sustain a guilty verdict, as we have noted, we cannot sanction a conspiracy conviction predicated on "conjecture." See United States v. Hardy, 895 F.2d 1331, 1335 (11th Cir. 1990); United States v. Kelly, 888 F.2d 732, 741 (11th Cir. 1989). Accordingly, Mathis' conviction must be reversed.

II. CONCLUSION

For the foregoing reasons, we AFFIRM the convictions and sentences of Reuben Averhart, Keith Coleman, Melody Fontenot, Christopher Gulley, Victor Moorer, Duane Roshell, Ursula Strong, Jeffrey Jerome Toler, and John Williams, and we REVERSE and VACATE the conviction of Traci Mathis.

AFFIRMED in part and REVERSED in part.

HENDERSON, Senior Circuit Judge, specially concurring:

I concur in the majority opinion authored by Judge Barkett and write separately to emphasize my concerns about the sufficiency of the evidence against Traci Mathis. This necessitates a brief summary of the evidence against that particular defendant.

At the time of these events, Mathis was a nurse's aide and the mother of a young daughter. While she leased an apartment on Guidy Lane in Pensacola, she and her daughter spent most of their time at Mathis' mother's house on Aaron Drive in the same city. Mathis' brother had introduced her to Rod Savage, the central figure of this conspiracy, in 1987. Until her brother married, Savage was in the habit of dropping by the Mathis household on Aaron Drive. Mathis and Savage apparently dated briefly in 1994 but were never romantically involved at any time.

In October 1995, Savage went by the Aaron Drive house to seek Mathis' permission to stay in her Guidy Lane apartment for a few days because he had had a fight with his girlfriend. Mathis agreed and gave him a key to the apartment. On November 3, 1995, Mathis encountered

Savage and asked for the return of her key. Savage told her that he had lost it. Mathis had the locks changed the next day.

The bulk of the government's case against Mathis consisted of five intercepted conversations between Savage and her, all initiated by Savage, between November 22 and December 9, 1995. In the first call, Savage protested that she had changed the lock and told her he needed to get something out of the apartment. Mathis apparently reacted angrily to this news but said that, after he paid a $50.00 electricity bill, he could get his "bowls." In a second call about 20 minutes later, Savage again asked for a key to the apartment but Mathis declined. On November 24, 1995, Savage called Mathis at the apartment and she told him that he could come get his bowls.

Mathis testified that she went to her apartment on December 6, 1995 with a friend, where they encountered Savage. (It is not clear from the evidence how Savage gained access to the apartment.) She observed Savage go to the refrigerator/freezer and count some of its contents before he left the apartment. The fourth call came the following day. Savage called Mathis to complain that he was missing one of his "things." She responded that he would not get it back until he paid her $500.00. Mathis and several other witnesses testified that the money was for a VCR Savage had agreed to buy Mathis' daughter for Christmas. During the final call on December 9, 1995, she and Savage disagreed about the number of "bags" in the refrigerator. Marcus McCall and Leroy Coleman recalled that they went with Savage to Mathis' apartment on several occasions to prepare or obtain cocaine. They both testified, however, that Mathis was never there on any of those occasions and that they had brought all the bowls and other paraphernalia needed to prepare the drug.

Mathis was charged and convicted for conspiracy to possess with intent to distribute

21

crack cocaine. She was not charged with possession of cocaine, although apparently that was the substance in the bowl belonging to Savage that she took at one point. The government contends that Mathis' act of demanding payment for the bowl she removed from the refrigerator is evidence of a prior agreement that Savage would pay her for the use of her apartment to cook the crack cocaine. While the majority opinion notes that the government's evidence might establish criminal blackmail or unlawful possession of drugs, it does not establish beyond a reasonable doubt that Mathis joined the unlawful conspiracy charged in the indictment.

In my view, this is a very close case. To support a conviction for conspiracy, the government must establish beyond a reasonable doubt that a conspiracy existed, that the defendant knew of the essential objectives of the conspiracy and that the defendant knowingly and voluntarily participated in the conspiracy. See United States v. Calderon, 127 F.3d 1314, 1326 (11th Cir. 1997). Mathis' conduct over the period of several weeks from late October to early December 1995 may be said to have shown that she knew of the conspiracy but is not evidence that she agreed to aid its objectives. Changing the locks immediately after Savage told her he had lost the key and then refusing to give him a new key certainly can not be viewed as furthering the objectives of the conspiracy. Moreover, even her demand for payment of the $500.00 before returning the bowl was not in furtherance of the conspiracy's objectives. To the contrary, it seems to constitute only interference with the business of the conspiracy. At some point after she changed the locks, Mathis may have become aware of what Savage had been doing in her apartment. That is not proof that her conduct was in pursuit of the objectives of the conspiracy.

To sustain the conviction, we must examine the evidence de novo in the light most favorable to the government to determine whether a reasonable jury could have concluded

beyond a reasonable doubt that Mathis was guilty of conspiring to possess with intent to distribute cocaine. U.S. v. Lopez-Ramirez, 68 F.3d 438 (11th Cir. 1995). I do not believe the government's evidence against Mathis was sufficient to meet that burden.

BLACK, Circuit Judge, concurring in part and dissenting in part:

I concur except as to Traci Mathis. Upon review of the testimony at trial and the taped conversations between Savage and Mathis, I believe the Government presented sufficient evidence to support the jury's verdict against Mathis. Further, the jury was entitled to disbelieve Mathis' testimony at trial and use that testimony as substantive evidence against her. *United States v. Brown*, 53 F.3d 312, 314-15 (11th Cir. 1995) (citations omitted). As we stated in *Brown*, "when a defendant chooses to testify, [s]he runs the risk that if disbelieved the jury might conclude the opposite of [her] testimony is true." *Id.* at 314 (internal quotations and citations omitted).

Although the evidence presented at trial was sufficient to support Mathis' conviction, I am sympathetic with the result that the majority would reach because the sentencing guidelines appear unduly harsh as applied to Mathis in this case.[14] It is unfortunate the district court did not have the discretion it had pre-guidelines.

---

[14] It appears from the judgment that the district court judge shared this view and departed three levels under 18 U.S.C. § 3553(b) and U.S.S.G. § 5K2.0 to reflect what he described as Mathis' "marginal guilt" and "lack of participation in furtherance of the conspiracy."

23