[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-15560
Non-Argument Calendar
_____

D.C. Docket No. 6:10-cr-00231-GKS-GJK-2


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSE NUNEZ-VALENCIA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 8, 2012)

Before CARNES, BARKETT and MARCUS, Circuit Judges.

PER CURIAM:

A jury convicted Jose Nunez-Valencia of conspiracy to possess with intent to distribute cocaine and methamphetamine in violation of 21 U.S.C. § 841(a)(1) and § 846. He appeals that conviction, contending that the government presented insufficient evidence to support it.

## I.

At trial, the government's evidence established the following. As part of a joint Drug Enforcement Agency and Kissimmee Police Department investigation, an undercover Kissimmee Police Department detective purchased methamphetamine through a dealer, Rafael Hernandez. Hernandez told the undercover detective that he was interested in buying "kilogram quantities of cocaine," so a DEA confidential source contacted Hernandez and told him that he had 50 kilograms of cocaine for sale. Police were aware, however, that Hernandez could not finance the deal on his own and possibly had to "bring in other people that were capable of purchasing those types of quantities."

Hernandez then called Tedoro Gonzalez-Mendiola, who in turn contacted Nunez-Valencia about the potential drug deal. Gonzalez-Mendiola, who later pleaded guilty to a conspiracy charge related to this case, testified that Nunez-Valencia offered to pay Gonzalez-Mendiola $5,000 to drive him from Atlanta, Georgia to Kissimmee, Florida to see the drugs before purchasing them.

2

Gonzalez-Mendiola agreed.

The Kissimmee detective and the DEA source arranged a meeting at a Denny's restaurant near Kissimmee with Nunez-Valencia, Gonzalez-Mendiola, Hernandez, and another man, Henry Flores, who all arrived in the same Ford pickup truck. At the meeting, Hernandez indicated that the undercover detective and DEA source should deal with Nunez-Valencia. The undercover detective testified: "Every time we asked a question where like a major decision has to be made, for the most part everybody turned their heads toward [Nunez-Valencia] kind of like looking for his advice or what he actually wanted." Nunez-Valencia demanded to see the cocaine in person before buying it, and at the end of that meeting, they had discussed that Nunez-Valencia and Gonzalez-Mendiola would purchase five kilograms of cocaine for $20,000 each and they would get another two kilograms of cocaine in exchange for providing the undercover detective and the DEA source two kilos of methamphetamine.

That group met again later that day in a nearby parking lot. Arriving again in the same Ford pickup truck were Nunez-Valencia, Gonzalez-Mendiola, Hernandez, Flores, and a fifth man, Miguel Solorzano-Hernandez. Nunez-Valencia and Hernandez entered an undercover vehicle that had video and audio recording devices. Nunez-Valencia again discussed purchasing five kilograms of

cocaine for $20,000 each and exchanging two kilograms of cocaine for two kilograms of methamphetamine. Nunez-Valencia eventually said that they only had $60,000 and offered to trade $40,000 worth of methamphetamine for $40,000 worth of cocaine. Nunez-Valencia said he could get the methamphetamine in seven hours, precisely the amount of time it takes to drive from Atlanta to Kissimmee. They agreed to a barter of methamphetamine and cocaine but did not specify how much. The men decided to do the exchange the next day at an undetermined location after the methamphetamine arrived. But after that meeting neither Nunez-Valencia nor any of his co-conspirators arranged to complete the transaction.

Gonzalez-Mendiola testified that Nunez-Valencia had told him that "nothing had been done because there were police officers" and that Nunez-Valencia had suspected a video camera was located within the rear-view mirror of the undercover vehicle. He also testified that Nunez-Valencia was nervous after the second meeting and said he had "messed up because he told them that he was going to exchange methamphetamine for cocaine." Solorzano-Hernandez also testified against Nunez-Valencia at trial, telling the jury that Nunez-Valencia was nervous after that meeting "[b]ecause he kind of saw that they were like from the police."

4

After the government presented its case, Nunez-Valencia moved for a judgment of acquittal on the grounds that the government failed to make a prima facie case of conspiracy against him. The court denied that motion. The jury found him guilty, and the district court entered a judgment of conviction and then sentenced him to 240 months in prison. Nunez-Valencia now appeals the denial of his motion for a judgment of acquittal on the grounds that the evidence against him was insufficient.

## II.

We review de novo a district court's denial of a motion for judgment of acquittal. United States v. Hernandez, 433 F.3d 1328, 1332 (11th Cir. 2005). "In determining whether the government produced sufficient evidence, we must review the evidence in the light most favorable to the government and draw all reasonable factual inferences in favor of the jury's verdict." United States v. Westry, 524 F.3d 1198, 1210 (11th Cir. 2008) (quotation marks omitted). To uphold the denial of a motion for judgment of acquittal based upon sufficiency of the evidence, we need only conclude "that a reasonable fact-finder could have determined that the evidence proved [Nunez-Valencia's] guilt beyond a reasonable doubt." Id. (quotation marks omitted).

Under 21 U.S.C. § 841 and § 846, it is illegal for any person to conspire to

possess cocaine or methamphetamine with intent to distribute it. 21 U.S.C. §§ 841, 846. To sustain a conviction for conspiracy, the government must prove beyond a reasonable doubt that "(1) an [illegal] agreement existed among two or more persons; (2) the defendant knew of the general purpose of the agreement; and (3) the defendant knowingly and voluntarily participated in the agreement." United States v. Toler, 144 F.3d 1423, 1425 (11th Cir. 1998) (quotation marks and ellipses omitted).

The elements of conspiracy are frequently proven by circumstantial, rather than direct, evidence because conspiracy is "predominantly mental in composition." Westry, 524 F.3d at 1212. The government does not need to prove that a formal agreement existed, "but may instead demonstrate by circumstantial evidence a meeting of the minds to commit an unlawful act." Toler, 144 F.3d at 1426 (quotation marks omitted); see also United States v. Badolato, 701 F.2d 915, 920 (11th Cir. 1983) (holding that an agreement to purchase large quantities of marijuana existed for purposes of § 846 because the record contained substantial evidence of an agreement even though co-conspirators had not finalized the price, quantity, or quality of the marijuana ). "[A] plan may be pretty half-baked and still be a criminal conspiracy if the intentions of the participants are illicit, . . . [and] sheer impossibility is no defense." United States v. Jones, 765 F.2d 996,

1002 (11th Cir. 1985).

## III.

Nunez-Valencia contends that the evidence against him was insufficient to support a guilty verdict against him for conspiracy for three reasons. First he contends that the evidence showed only that he negotiated terms of an agreement to purchase illicit drugs but that no agreement was actually reached. To the contrary, the evidence at his trial showed that Nunez-Valencia had agreed to purchase from the DEA source at least five kilograms of cocaine at a total price of $100,000. Those were the terms that Nunez-Valencia had settled on at the end of the first meeting with the DEA source, and those were the same terms that existed at the start and the end of their second meeting later that day. The only open term to that agreement was how Nunez-Valencia would pay—what part of the agreed upon amount of cocaine would be bought with cash or exchanged for methamphetamine. Nunez-Valencia and the DEA source had agreed upon a price and a quantity of cocaine; an agreement was not absent merely because the method of payment had not yet been determined. See Badolato, 701 F.2d at 920.

Next Nunez-Valencia contends that the evidence was insufficient because there was no proof that he had the resources to purchase the $100,000 in cocaine that the government said he conspired to buy. As we have previously noted,

however, "sheer impossibility is no defense" to this conspiracy charge. Jones, 765 F.2d at 1002.

Nunez-Valencia's last contention is that the evidence was insufficient to prove that he conspired to purchase the cocaine because there never was an exchange of money or drugs. That contention is meritless. "No showing of an overt act is required in conspiracy cases under 21 U.S.C. § 846." United States v. Blasco, 702 F.2d 1315, 1330 (11th Cir. 1983). All the government needed to prove was that there was an agreement that Nunez-Valencia was aware of and that he knowingly and voluntarily entered. See Toler, 144 F.3d at 1425.

The evidence at trial showed that after learning of a possible deal to buy five kilograms of cheap cocaine in Kissimmee, Nunez-Valencia offered to pay Gonzalez-Mendiola $5,000 to drive him from Atlanta to Kissimmee so that he could see the cocaine before purchasing it. Gonzalez-Mendiola did so. Nunez-Valencia arrived to the first meeting in the same pickup truck as his co-conspirators. That evidence was probative of Nunez-Valencia's guilt. See United States v. Gamboa, 166 F.3d 1327, 1332 (11th Cir. 1999). During that first meeting, Nunez-Valencia was the designated representative for his co-conspirators; they deferred to him on the major decisions about the purchase of the cocaine. He negotiated the price and terms, and stipulated conditions, such as

seeing the cocaine before purchasing it.

At the second meeting, he again arrived in the same pickup truck as his co-conspirators. During that meeting, police recorded Nunez-Valencia negotiating the terms of the purchase of the cocaine and later played that recording for the jury. Gonzalez-Mendiola and Solorzano-Hernandez testified that the only reason why the agreement was not later carried out was because Nunez-Valencia discovered that the purported cocaine dealers were actually law enforcement officers, not because there was no actual agreement to purchase the cocaine.

Based on all of that evidence, a reasonable jury could find Nunez-Valencia guilty beyond a reasonable doubt of conspiring to possess cocaine and methamphetamine for the purpose of distributing them. See Toler, 144 F.3d at 1428.

**AFFIRMED.**