[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 24-10059

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

NELLY ANDERSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:23-cr-20124-CMA-1

_____

Before WILSON, ANDERSON, and HULL, Circuit Judges.

PER CURIAM:

Following a jury trial, Nelly Anderson appeals her convictions for conspiring to defraud the United States and paying kickbacks for referrals of Medicare patients. On appeal, Anderson challenges the sufficiency of the evidence supporting her three convictions. After careful review, we conclude that ample evidence supported Anderson's convictions. Accordingly, we affirm Anderson's convictions.

## I. TRIAL EVIDENCE

A federal grand jury indicted Anderson on one count of conspiracy to defraud the United States and to pay health care kickbacks, in violation of 18 U.S.C. § 371 (Count 1); two counts of payment of kickbacks in connection with a federal health care program, in violation of the Anti-Kickback statute, 42 U.S.C. § 1320a-7b(b)(2)(A) (Counts 2 and 3); and two counts of destruction, alteration, and falsification of records in a federal investigation, in violation of 18 U.S.C. § 1519 (Counts 4 and 5).

Anderson pled not guilty and proceeded to trial. We recount the trial evidence relevant to the sufficiency-of-evidence issues presented on appeal.

## A. Dial 4 Care

Anderson was one of four owners of Dial 4 Care Inc. ("Dial 4 Care"), a home health services company that provided services to Medicare patients. To serve Medicare patients, a health care provider must enroll as a Medicare provider. As part of the enrollment process, the provider must certify compliance with the Anti-Kickback statute, which prohibits payments between two or more parties that induce a person "to refer" an individual to a health care provider for a service payable under Medicare. *See* 42 U.S.C. § 1320a-7b(b).

Dial 4 Care enrolled as a Medicare provider. On its enrollment application, Dial 4 Care certified that it would comply with the Anti-Kickback statute, abide by Medicare laws and regulations, and not pay kickbacks. As Dial 4 Care's authorized official, Anderson signed the certification.

Between 2017 and 2021, Medicare paid Dial 4 Care over $8 million. Medicare, however, would not have paid Dial 4 Care for its Medicare patients' claims if it knew that Dial 4 Care paid for the patient's referral because that would violate the Anti-Kickback statute.

## B. Dial 4 Care's Use of Marketers

Anderson hired marketers to recruit patients to Dial 4 Care. One such marketer was Denisse Hanley, who testified at trial. From 2015 to 2021, Hanley worked for Dial 4 Care and reported directly to Anderson. Hanley learned of the job opportunity with Dial 4 Care through a meeting at the nursing home where she

worked.  At the meeting, one of Dial 4 Care's owners told the nursing home employees that they could earn $300 to $350 by referring patients to Dial 4 Care.

As a Dial 4 Care marketer, Hanley went to hospitals and medical offices to introduce Dial 4 Care to patients.  Hanley recruited only Medicare patients for Dial 4 Care.

Hanley signed a contract with Dial 4 Care that provided that she would be paid $50 per hour.  But the $50 hourly rate was a "lie" because Hanley was actually paid for each patient that she brought to Dial 4 Care, not per hour.  If a patient refused service, Dial 4 Care did not pay Hanley regardless of how many hours Hanley spent recruiting the Medicare patient.  If a Medicare patient terminated Dial 4 Care's services early, Dial 4 Care deducted money from Hanley's paychecks.

Dial 4 Care's payment to Hanley fluctuated between $300 and $350 for each patient referral but increased to $400 or $500 per patient depending on the services that the patient needed.  If a patient needed treatment for just one condition, Hanley's referral payment would be within a range of $300 to $350.  But if the patient "was getting all the services," then the referral payment would be within a range of $400 to $500.

When Hanley successfully referred a Medicare patient to Dial 4 Care, she submitted invoices to get paid for the referral. Anderson directed Hanley to write on the invoices a number of hours that "match[ed]" her referral fee. In other words, Anderson directed Hanley to take the $50 contractual hourly rate and

multiply it by the number of hours necessary to match the actual per-patient payment amount. Anderson also directed Hanley not to log her hours in whole numbers so as not to "call attention to it."

Although multiple people ran Dial 4 Care's operations, Anderson was the "number one" person. Anderson signed Hanley's checks. If Hanley had a problem with her check, she spoke to Anderson because Anderson was "the person in control" and "had the power to be able to resolve the problem."

Dial 4 Care's checks contained invoice numbers, dates, and names of patients. The government identified two specific invoices and corresponding checks. In August 2019, Hanley submitted invoice number 89, billing Dial 4 Care $500 for referring a Medicare patient. Dial 4 Care then wrote a $500 check, dated August 23, 2019, that was payable to Hanley. The check listed invoice number 89, the date, and the patient's name on the memo line. This check formed the basis of Count 2 of the indictment.

In October 2021, Hanley submitted invoice number 09, billing Dial 4 Care $400. Dial 4 Care then wrote a $400 check, dated October 29, 2021, that was payable to Hanley. The check listed invoice number 21-09 and the date in the memo line. This check formed the basis of Count 3 of the indictment.

Between 2017 and 2021, Dial 4 Care paid Hanley a total of $36,355. Dial 4 Care's checks were generally written for amounts in $100 increments, including $300 and $500 amounts.

In addition to Hanley, Dial 4 Care employed other marketers such as Celeste Brens. Brens and the other marketers signed the same marketing contract that Hanley signed. Like Hanley, Brens submitted invoices in the amount of $500 for each patient referral, and Dial 4 Care subsequently sent Brens checks that corresponded to the invoice amounts.

## C. Investigation and Revised Invoices

In April 2021, federal agents visited Hanley to discuss her employment with Dial 4 Care and review several invoices and checks. Hanley eventually stopped working at Dial 4 Care because she thought "things weren't being done correctly."

In November 2021, Anderson asked Hanley to come to Dial 4 Care's office to "correct" some of her invoices. Specifically, Anderson showed Hanley invoices that did not match pay stubs for the corresponding checks and asked Hanley to change the invoices. To make the invoices match, Hanley changed the number of hours worked and the descriptions of the work performed.

For example, Hanley changed a $1000 invoice to $600 because she had been paid only $600 via the check that corresponded to the $1000 invoice. In another instance, Hanley changed a $525 invoice to $400—the amount paid to her in the corresponding check. The mismatches between the invoices and the checks occurred when Dial 4 Care did not pay the full invoice amount because the Medicare patient declined certain services or terminated services early.

Hanley did not initially think there was anything wrong with correcting the invoices, but she reconsidered after remembering her visit with federal agents. When Hanley realized there could be a problem, she began photographing the invoices. Hanley eventually turned the photographs over to federal agents.

## D. Verdict and Sentence

At the conclusion of the government's case-in-chief, Anderson moved for a judgment of acquittal. Anderson contended, in relevant part, that the government presented insufficient evidence to establish a conspiracy and that the payments to Hanley were not kickbacks for referrals. The district court denied the motion. Anderson did not testify or present evidence.

The jury found Anderson guilty of Counts 1, 2, and 3 and acquitted Anderson of Counts 4 and 5. Anderson renewed her motion for a judgment of acquittal and moved for a new trial. The district court denied both motions. The district court sentenced Anderson to 38 months' imprisonment followed by 3 years of supervised release. Anderson timely appealed.[1]

## II. SUFFICIENCY OF THE EVIDENCE

On appeal, Anderson argues that the evidence was insufficient to support her three convictions.

---

[1] On appeal, Anderson does not challenge her sentence. Anderson challenges only the sufficiency of the evidence to support her three convictions.

We review *de novo* challenges to the sufficiency of evidence, viewing "the evidence in the light most favorable to the government and draw[ing] all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Wilson*, 788 F.3d 1298, 1308 (11th Cir. 2015). The jury's verdict "cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *Id.* (quotation marks omitted).

## A. Conspiracy Conviction

We first address Anderson's conspiracy conviction in Count 1. Anderson argues that the government did not present direct or circumstantial evidence that (1) a kickback scheme existed, and (2) she participated in an agreement to pay kickbacks.

To sustain a conspiracy conviction under 18 U.S.C. § 371, the government must prove "(1) an agreement among two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in the agreement; and (3) an overt act by a conspirator in furtherance of the agreement." *United States v. Gonzalez*, 834 F.3d 1206, 1214 (11th Cir. 2016) (quotation marks omitted).

To obtain a conviction, "the government need not demonstrate the existence of a formal agreement, but may instead demonstrate by circumstantial evidence a meeting of the minds to commit an unlawful act." *United States v. Toler*, 144 F.3d 1423, 1426 (11th Cir. 1998) (internal quotation marks and citation omitted). Additionally, "the government need not prove that the defendant

knew all of the details or participated in every aspect of the conspiracy. Rather the government must only prove that the defendant knew the essential nature of the conspiracy." *United States v. Sosa*, 777 F.3d 1279, 1290 (11th Cir. 2015).

Here, more than enough evidence presented at trial supported Anderson's conspiracy conviction under § 371.

First, a reasonable jury could find that there existed an agreement to pay kickbacks to marketers for referring Medicare patients to Dial 4 Care. Hanley's testimony established that Anderson and Hanley had an agreement for Anderson to pay Hanley on a per-patient basis, with the payment amount depending on the type of services the patient received. Although the official marketing contract stated that Hanley would be paid per hour, Hanley testified that the contract was a "lie," as she was paid per patient that she referred to Dial 4 Care instead.

Second, ample evidence established that Anderson knew of the agreement and participated in it. Anderson hired the marketers. She explained to Hanley how to fill out her invoices to "match" the number of hours worked multiplied by the $50 hourly rate with the referral fee. She also directed Hanley not to log her hours in whole numbers so as not to "call attention to it."

Anderson was the "person in control" who signed Hanley's checks. The checks contained invoice numbers and the names of patients. The checks reflected the ranges of per-patient referral amounts that depended on the type of services the patient received. And if a patient terminated services early, Dial 4 Care deducted

money from Hanley's checks.    When federal agents began investigating Dial 4 Care, Anderson asked Hanley to "correct" her invoices so that the hours worked, at $50 per hour, matched the payment amounts when those payments were reduced because a patient terminated Dial 4 Care's services early.

This evidence is more than sufficient for the jury to infer (1) Anderson and the marketers had an agreement to pay kickbacks for referrals, (2) Anderson knowingly and voluntarily participated in the agreement, and (3) the existence of an overt act by her. *See Gonzalez*, 834 F.3d at 1214.    The government did not need to demonstrate the existence of a formal agreement; the circumstantial evidence it presented was sufficient to show a meeting of the minds to pay kickbacks. *See Toler*, 144 F.3d at 1426. Further, the evidence established that Anderson "knew the essential nature of the conspiracy." *See Sosa*, 777 F.3d at 1290. Accordingly, we affirm Anderson's conspiracy conviction in Count 1.

## B. Payment-of-Kickbacks Convictions

Anderson also contends that the evidence was insufficient to support her substantive convictions in Counts 2 and 3 for violating the Anti-Kickback statute.    Anderson argues that there is no evidence in the record of an actual kickback, an offer to pay a kickback, or the receipt of a kickback or offer.

The Anti-Kickback statute makes it illegal to:

[K]nowingly and willfully offer[] or pay[] *any remuneration* (including any kickback, bribe, or rebate)

> directly or indirectly, overtly or covertly, in cash or in kind to *any person* to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of *any item or service* for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b)(2)(A) (emphasis added).    The Anti-Kickback statute "speaks broadly to 'whoever knowingly and willfully . . . pays any remuneration' to '*any person* to induce such person . . . to refer an individual'" for a service paid by Medicare. *United States v. Vernon*, 723 F.3d 1234, 1254 (11th Cir. 2013) (omissions in original) (quoting  42 U.S.C. § 1320a-7b(b)(2)(A)). The Anti-Kickback statute criminalizes "commission-based arrangements between health care providers and third parties." *Id.* at 1256.

To prove a substantive violation of the Anti-Kickback statute, the government must establish that the defendant (1) knowingly and willfully (2) paid money, directly or indirectly, (3) to induce the referral of individuals to a health care provider for the furnishing of services (4) to be paid by Medicare. *Id.* at 1252.

Here, the record contains sufficient evidence by which a reasonable jury could find that Anderson violated the Anti-Kickback statute.  As discussed above, the evidence showed that (1) Anderson explained to Hanley how to fill out invoices to "match" her hours, at the $50 hourly rate, to the fixed per-patient amount for referrals; (2) Anderson signed the checks to Hanley in amounts corresponding to the per-patient ranges based on the

services the patient received; and (3) Dial 4 Care deducted the money from the checks if the patient declined or terminated Dial 4 Care's services.

Regarding Count 2, the government showed that, in August 2019, Hanley submitted an invoice billing Dial 4 Care $500, and Dial 4 Care subsequently wrote a $500 check to Hanley with the invoice number and the Medicare patient's name on the memo line. Regarding Count 3, the government showed that, in October 2021, Hanley submitted an invoice for $400, and Dial 4 Care then wrote Hanley a $400 check with the invoice number on the memo line.

These invoices and corresponding checks, together with Hanley's testimony that she was paid for each patient referral and not by the hour, support the jury's findings that (1) the payments were kickbacks to induce the marketers to refer Medicare patients to Dial 4 Care, and (2) Anderson made the payments knowingly and willfully. *See* 42 U.S.C. § 1320a-7b(b)(2)(A); *Vernon*, 723 F.3d at 1254; *Nerey*, 877 F.3d at 968. As with Anderson's conspiracy conviction, the absence of direct evidence of a formal payment or offer of a kickback does not preclude the jury from inferring, in light of the overwhelming circumstantial evidence described above, that Anderson knowingly and willfully paid Hanley for patient referrals. And it is undisputed that Hanley recruited only Medicare patients for Dial 4 Care.

Anderson argues that the Anti-Kickback statute proscribes only paying kickbacks to health care providers, and because Hanley

is not a health care provider, the Anti-Kickback statute does not apply. But the Anti-Kickback statute prohibits paying remuneration to "*any* person" to induce that person to refer an individual for a service payable by Medicare. 42 U.S.C. § 1320a-7b(b)(2)(A) (emphasis added); *Vernon*, 723 F.3d at 1252. The Anti-Kickback statute is interpreted "broadly," and a non-physician such as Hanley can still "refer" patients under the statute. *Vernon*, 723 F.3d at 1254 ("[T]he plain language of the statute is not limited to payments to physicians who prescribe medication."); *see also Sosa*, 777 F.3d at 1288, 1293-94 (sufficient evidence showed that the defendant violated the Anti-Kickback statute by paying a recruiter to refer patients to a clinic); *United States v. Young,* 108 F.4th 1307, 1318-19 (11th Cir. 2024) ("Even if de la Cruz could not and did not write or sign the prescriptions herself, she was in a position to ensure that the prescriptions were sent.").[2]

We thus conclude that a reasonable jury could find that the evidence sufficiently established that Anderson knowingly and willfully furnished kickbacks to marketers for referring patients to Dial 4 Care. *See Vernon*, 723 F.3d at 1252.

---

[2] Anderson did not assert, either below or on appeal, any rights under the "safe harbor" provision of the Anti-Kickback statute. *See* 42 U.S.C. § 1320a-7b(b)(3)(B).

### III. CONCLUSION

We affirm Anderson's convictions for conspiring to defraud the United States and making payments in violation of the Anti-Kickback statute.

**AFFIRMED.**