[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 23, 2002
THOMAS K. KAHN
CLERK

No. 00-15777

_____

D.C. Docket No. 99-06146-CR-WDF

UNITED STATES OF AMERICA,

Plaintiff-Appellant,
Cross-Appellee,

versus

TERRENCE SMITH,

Defendant-

Appellee,

Cross-Appellant.

_____

Appeals from the United States District Court for the
Southern District of Florida

_____

**(April 23, 2002)**

Before HULL, MARCUS and FARRIS[*], Circuit Judges.

HULL, Circuit Judge:

_____

[*]Honorable Jerome Farris, U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

The government appeals the defendant Terrence Smith's 120-month term of imprisonment imposed after Smith was found guilty by a jury of two drug offenses. Smith cross-appeals and maintains that the evidence at trial was insufficient to sustain his drug conspiracy conviction. After review and oral argument, we affirm Smith's drug conspiracy conviction, but reverse his 120-month term of imprisonment because the district court erred in granting a downward departure. The district court stated that "[i]f it is determined that further downward adjustments are not permitted, the sentence imposed would be 210 months." United States v. Smith, 125 F. Supp. 2d 486, 490 (S.D. Fla. 2000). We so determine and remand this case to the district court with directions to impose a 210-month term of imprisonment.

## I. FACTS

A two-count indictment charged defendants Terrence Smith and Gregory Jackson with conspiracy to possess with intent to distribute "a detectable amount of cocaine base, commonly known as 'crack' cocaine," from April 20, 1999, through April 21, 1999, in violation of 21 U.S.C. §§ 846, 841(a)(1), and with possession with intent to distribute "a detectable amount of cocaine base, commonly known as 'crack' cocaine," on April 21, 1999, in violation of 21 U.S.C.

§ 841(a)(1). Smith's co-defendant Jackson pled guilty, but Smith entered a not guilty plea and proceeded to a jury trial.

## A.    Section 851 Enhancement

Prior to trial, the government filed an Information notifying Smith of its intent to seek an enhanced mandatory minimum penalty of life imprisonment under 21 U.S.C. §§ 851 and 841(b). The Information listed and attached copies of four prior felony state drug convictions.[1] Prior to trial, the government filed a supplement to that § 851 Information, listing another prior felony state drug conviction and again notifying Smith that he faced a mandatory minimum penalty of life imprisonment under 21 U.S.C. §§ 851 and 841(b).[2]

## B.    Trial Evidence

The following evidence was presented at trial. Kenneth Ruff had been convicted of a drug charge and agreed to act as an informant to reduce his sentence. With approval of the Broward County Sheriff's Office ("BSO"), Ruff enlisted the help of his cousin, Jimmy Tucker, as a paid confidential informant, to

---

[1] The four prior convictions were all felony convictions for possession of cocaine in Case Nos. 93-014263CF10A, 94-2380CF10A, 94-1883CF10A, and 94-3844CF10A in state court in Broward County, Florida.

[2] The fifth prior conviction was a felony conviction for possession of cocaine with intent to distribute in Case No. 90-24786CF10A in state court in Broward County, Florida.

3

introduce him to drug dealers.[3] Tucker made contact with one of those dealers, Gregory Jackson, through Tucker's first cousin, the defendant Terrence Smith. Tucker knew that Smith was involved in selling crack cocaine, as Tucker had purchased crack from Smith previously and had seen Smith sell drugs to others. Also, Tucker did not know Jackson well himself, but he knew that Smith was familiar with Greg Jackson.

On April 20, 1999, Jackson called Tucker's beeper number and, when Tucker returned his call, Jackson asked Tucker and Ruff (Tucker's cousin) to report to a house at 5669 Mayo Street to discuss the purchase of crack cocaine. Once at the house, Tucker and Ruff met Jackson, who told them that he "could not get his hands on the drugs" that day, and they postponed the drug purchase to the next day, April 21.

On April 21, 1999, before returning to the Mayo Street house, Tucker and Ruff met with BSO officers, who wired Ruff with an audio recorder and his car with a video camera, and gave the two men $1,875 cash with which to purchase crack cocaine from Jackson. The officers had photocopied the cash to record the

---

[3] Tucker had two prior state court drug convictions and was familiar with drug sellers in the Carver's Ranches area.

serial numbers, and they searched Tucker, Ruff, and Ruff's car to ensure that they did not have any drugs.

Under surveillance by the officers, Tucker and Ruff returned to 5669 Mayo Street to meet Jackson. Instead, Smith, who lived next door, was waiting at the location when they arrived. Smith told Tucker that Jackson was not there, and that Jackson was still unable to get to his warehouse to get the drugs. According to Tucker, Smith agreed to try to "get what [Tucker and Ruff] came for" himself. Tucker testified, "Greg Jackson did not want to do the deal because I guess he did not know Mr. Ruff but he knew me."

Tucker and Ruff spoke with Smith about the amount of crack cocaine they wanted (two ounces), a negotiation both captured on tape and observed from afar by the police. The two-ounce quantity was to be sold in fifteen small pieces, or "8-balls," each about three grams, and Smith said the going rate was about $125 per 8-ball. Smith left the house to locate another seller for the amount of crack cocaine Ruff and Tucker were interested in.

Smith was unsuccessful in locating someone who had the amount of drugs on hand to sell, and later returned to the Mayo house. According to Tucker, Smith had explained to Tucker that he would set up a "pickup" of the money at a friend's house, arrange to get the drugs from Jackson, and do the deal himself. Smith asked

5

Ruff and Tucker to drive him to his car. Ruff and Tucker, under surveillance by the police, left Smith at his car for Smith to go arrange the deal. Smith exchanged numbers with Ruff and Tucker and promised to call them when he had the cocaine. The officers then met with Ruff and Tucker, who were searched a second time, and together they waited for Smith's call.

Smith called later that day, instructing Ruff and Tucker to meet him at a house occupied by Pitts, a mutual friend of Smith and Jackson. When Ruff, still wearing a wire, and Tucker arrived at Pitts's house, Smith and Pitts were there, waiting to discuss the cocaine purchase. Ruff and Tucker negotiated to pay $1,875 to purchase fifteen 8-balls. Tucker and Ruff attempted to negotiate with Smith for an extra one or two 8-balls for the same price, but were unsuccessful. Ruff and Tucker each counted the money out loud before tendering the $1,875 cash to Smith, who accepted the cash. Tucker and Smith then left Pitts' house and traveled in Smith's car (outside the scope of police surveillance) to the corner, where they were supposed to meet Jackson, while Ruff stayed behind.

When Tucker and Smith arrived at the corner, a Jeep that Tucker recognized as Jackson's was already waiting.[4] Smith got out of his car and got into the Jeep,

---

[4] Tucker was unable to identify the person who was driving the Jeep as Jackson because he was unable to see inside it.

which drove away.  Tucker waited on the corner for Smith to return, but Smith returned on foot to Pitts's house instead.  Upon Smith's arrival, Ruff called Tucker, who then returned to Pitts's house.

Upon meeting back at Pitts's house, Ruff, Tucker, and Smith walked outside to Ruff's car where Smith showed them the crack cocaine concealed "in the pouch of his pants."  The crack cocaine was in individual plastic bags inside one big plastic bag.  Ruff then got into the driver's seat of the car and Tucker got in the back passenger seat.  Smith entered Ruff's car, got in the front passenger's seat and obtained their final approval.  He then removed the bag containing the drugs from his pants, handed the bag to Ruff, and left the car.  Before leaving Ruff's car, Smith gave his telephone number to Ruff and Tucker so that they could call him with their future drug requests and avoid the delay experienced that day in waiting while Smith got the drugs from a supplier.

After they left Smith, Ruff and Tucker proceeded to the prearranged meeting place where they gave the bag of drugs obtained from Smith to the BSO officers.  At that time, the officers also removed Ruff's recording device, as well as the video camera from the backseat of Ruff's car.[5]  One of the officers, Sergeant

---

[5] At trial, the government admitted into evidence, without objection from the defendant Smith, the audiotapes of the meetings between Ruff, Tucker and Smith on April 21, 1999, which had been recorded by Ruff's wire, as well as transcripts of the

Preston, performed a field test on the substance in the plastic bag obtained from Ruff and Tucker, and it tested positive for cocaine. Sergeant Preston forwarded the drugs in the plastic bag to the BSO's laboratory for drug and fingerprint analysis.

At trial, after Tucker's testimony, the government called Sergeant Preston to testify about the investigation and the laboratory analysis. After introducing the bag of crack cocaine as Exhibit 1A, the government also introduced the laboratory analysis report as Exhibit 1B. Sergeant Preston testified that the laboratory analysis indicated that the plastic bag contained 55.6 grams of cocaine base.[6]

---

audiotapes. The government also admitted into evidence, without objection from Smith, a videotape of some of the events of April 21 which were recorded on the video camera hidden in the backseat of Ruff's car.

[6] The trial transcript reads:
Q [Government]: With respect to the laboratory analysis of the cocaine itself, where did you submit that?
A [Preston]: BSO lab.
Q: What were the results of the analysis?
A: It was positive for cocaine base.
Q: I will show you what has been marked as Government's Exhibit 1B. Do you recognize Government's Exhibit 1B?
A: Yes.
Q: What is Government's Exhibit 1B?
A: It's an analysis report.
Q: It's a report referenced to what?
A: Cocaine.
Q: Cocaine in this case?
A: Yes.
Q: What did the results show?
A: Positive test. Approximately 55.6 grams.

Defense counsel did not object to the laboratory analysis report or Sergeant Preston's testimony that the amount of drugs was 55.6 grams of cocaine base. The government also introduced a latent fingerprint report indicating that one latent thumb-print recovered from the plastic bag matched co-defendant Jackson's thumb-print.

After the government presented its case, Smith testified, admitting that he had gotten the crack cocaine from Jackson to distribute, but claiming that he did so on behalf of Tucker in order to help him set up Jackson, in exchange for an 8-ball. Smith also testified that he gave the $1,875 to Jackson and that he got the drugs from Jackson. Indeed, Smith testified, "I got the 55.6 grams." There was no evidence, however, that the BSO had ever engaged Smith as an informant to assist Tucker. Indeed, Tucker testified that he did not think Smith even had any reason to believe either he (Tucker) or Ruff was an informant. When asked, "Did Mr. Smith have any reason to believe or know that you were a confidential informant

---

...
Q: ...I will move Exhibit 1B into evidence, the laboratory analysis report.
[Defense counsel]: No objection.
Court: It is admitted.
That laboratory analysis report stated: "An examination conducted on the mentioned evidence revealed the presence of cocaine base (55.6 grams net weight in the twelve bags tested)."

9

or that Mr. Kenneth Ruff was a confidential informant working with law enforcement," Tucker responded, "No."

The jury found Smith guilty of both the possession with intent and the conspiracy counts.

## C.    Pre-Sentence Report

As for offense level, the Pre-Sentence Report ("PSR") first calculated Smith's offense level at 32 based on 55.6 grams of crack cocaine. See U.S.S.G. § 2D1.1(c)(4) (1998).[7] The PSR then increased Smith's offense level to 37 because he was a career offender under U.S.S.G. § 4B1.1 (1998). To be a career offender, a defendant must have at least two prior felony convictions and those convictions must be for either a crime of violence or a drug offense. U.S.S.G. § 4B1.1(3). Smith had six such prior felony convictions, including the five drug convictions (for which the government filed the § 851 Information) and one robbery with a deadly weapon. Under U.S.S.G. § 4B1.1, the offense level of a career offender is calculated by ascertaining the "offense statutory maximum" for

---

[7] Although the district court's Corrected Order in this case was dated November 9, 2000, the Judgment containing the sentence was signed by the district court on September 27, 2000, and filed the next day. Thus, we use the November 1998 Guidelines, which were the applicable Guidelines on September 27, 2000. U.S.S.G. § 2D1.1(c)(4) provides that at least 50 grams but less than 150 grams of cocaine base has a base offense level of 32.

the underlying criminal offense. U.S.S.G. § 4B1.1, cmt. 2. The PSR reported that the applicable statutory maximum for Smith's federal drug convictions was life imprisonment under 21 U.S.C. § 841(b)(1)(A). Because the applicable statutory maximum was life, Smith's total offense level was 37 under U.S.S.G. § 4B1.1.

As for criminal history, the PSR placed Smith in category VI on two independent grounds. First, Smith had 17 criminal-history points based on his five drug convictions, a robbery with a deadly weapon, and two separate misdemeanor offenses.[8] Because the instant drug offenses were within two years of release from state imprisonment, Smith received two more points for a total of 19 criminal-history points. Criminal history category VI applies to defendants with 13 or more criminal-history points. U.S.S.G. ch. 5, pt. A, cmt. 3 (1998). Second, Smith also qualified for criminal history category VI because he was a career offender and U.S.S.G. § 4B1.1 provides that "[a] career offender's criminal history category in every case shall be Category VI."

With an offense level of 37 and a criminal history category VI, Smith's guideline range was 360 months to life. The PSR also recommended that Smith

---

[8] Smith received two criminal-history points for each of his four cocaine possession convictions, three points for his robbery with a deadly weapon, three points for his possession with intent to distribute cocaine, two points for a misdemeanor petit theft conviction, and one point for another misdemeanor conviction.

receive a life sentence under 21 U.S.C. §§ 841(b)(1)(A) and 851. Specifically, § 841(b)(1)(A) provides for a mandatory minimum life sentence if a § 841 drug offense involves more than 50 grams of cocaine base and the defendant has two prior felony drug convictions. Smith's drug offense involved 55.6 grams of cocaine base and Smith had five prior felony drug convictions. Thus, Smith faced a statutory mandatory minimum life sentence under § 841(b)(1)(A). In addition, U.S.S.G. § 5G1.1(c)(2) provides that "the sentence may be imposed at any point within the applicable guideline range, provided that the sentence . . . is not less than any statutorily required minimum sentence." U.S.S.G. § 5G1.1(c)(2) (1998). Because Smith's statutory mandatory minimum sentence was life imprisonment, Smith's guideline sentence under U.S.S.G. § 5G1.1(c)(2) also became the life sentence required by statute.

## D.     Objections to Pre-Sentence Report

Smith objected to the PSR's recommended life sentence. In light of Apprendi v. New Jersey, 530 U.S. 466 (2000), Smith argued that his prescribed statutory maximum penalty was only twenty years under 21 U.S.C. § 841(b)(1)(C) because drug quantity was never pled in the indictment nor proven to the jury. Smith also asserted that because his prior convictions were neither pled in the indictment nor proven to a jury, they could not be used to calculate his guideline

sentence or to increase the applicable statutory maximum penalty. In response, the government argued, inter alia, that Apprendi did not apply because the weight of the drugs involved was stipulated at trial as 55.6 grams of crack cocaine and, therefore, deemed proven beyond a reasonable doubt.

Smith further maintained that he deserved a two-level minor-role reduction, since he was just a "mule" used to pick up and deliver the crack. The government responded that Smith was not a minor participant in the offense because the deal could not have been completed without him.

## E.    Sentencing Hearings

At two different sentencing hearings, the district court and Smith's counsel overtly explored ways for the court to get around imposing the mandatory life sentence recommended in the PSR. For example, at the initial sentencing on June 29, 2000, the district court reviewed the PSR and commented that "I don't have any discretion. The sentence is life and a fine of up to $16,000,000. I think this is a travesty." The district court then asked Smith's counsel how the court might "get around § 4B1.1," the career offender guideline. Smith's counsel suggested that mental problems resulting from Smith's long history of drug use might support a diminished-capacity departure. The district court continued the sentencing hearing so that Smith could be examined by a psychologist or psychiatrist.

13

When the sentencing hearing continued on September 26, 2000, Smith's counsel argued that under Apprendi, Smith's maximum statutory sentence was not life imprisonment, but was limited to twenty years under 21 U.S.C. § 841(b)(1)(C) because drug quantity had not been charged in the indictment nor proved to the jury beyond a reasonable doubt.[9] Smith's counsel ultimately acknowledged that the court could sentence Smith to up to thirty years under § 841(b)(1)(C) because of his prior drug convictions. Smith's request for a minor role reduction was also discussed. After this discussion, the court summarily stated that it "will accept the findings as made by the Probation Officer as his findings for the purpose of this hearing."

After in effect adopting the probation officer's finding that Smith was in criminal history category VI, the district court then explored on the record whether the court could reduce that category. The court asked if it was prohibited from

---

[9] The September 26 sentencing transcript indicates that although the district court orally continued the June 29 hearing for an evaluation, no follow-up order for an evaluation was entered by the district court, and thus no evaluation occurred. At the September 26 hearing, when defense counsel brought it to the district court's attention that Smith had not been evaluated, the court inquired, "What is there in the record to suggest that he needs an evaluation?" Smith's counsel responded: "Just extensive drug history, Judge. I believe from the time he was 15 years old to date that he was a heavy marijuana user. I think the court had some concern with his mental state." The district court responded, "Let's proceed," held the sentencing hearing, and sentenced Smith.

14

reducing Smith's criminal history category if the court found that the nature of his prior offenses was overstated. After reviewing Smith's prior convictions, the court concluded that his criminal history was "seriously overstated" because most of his prior felony offenses involved only possession of crack and only one offense involved an act of violence. After further discussion, the court reduced Smith's criminal-history points from 19 to 11, subtracting the eight points that Smith had received for his four prior convictions for cocaine possession, each of which were worth two points. See U.S.S.G. § 4A1.1(b) (1998).

The probation officer pointed out again that Smith was a career offender and remained in criminal history category VI under U.S.S.G. § 4B1.1 regardless of the number of criminal-history points assessed. After discovering the reduction in criminal-history points did not help decrease Smith's life sentence, the district court indicated it would revisit the Apprendi issue. After discussion, the district court stated, "My finding is that the Section 851 [sic] will not apply because the quantity was not charged and the jury made no finding that the quantity was 50 grams or more." It appears the district court, at this juncture, may have been conflating the effect of § 851 regarding Smith's prior convictions with the effect of drug quantity under § 841(b).

Before sentencing Smith, the district court never resolved nor stated a final offense level, a final criminal history category, or even a guideline range. Instead, the district court summarily sentenced Smith on each count to ten years in prison to be followed by five years of supervised release, the terms to run concurrently.

After the sentence was imposed, the government objected to the ten-year sentence. Specifically, the government objected to the district court's interpretation of Apprendi, the manner in which the court applied the U.S.S.G. § 4B1.1 career offender guideline, and its finding that Smith's criminal history category was seriously overstated. The government explained that "[t]here is no way you can come up with a 10-year sentence if you applied that [career offender] provision."

After the sentence was imposed, the probation officer also spoke up and pointed out problems with the court's ten-year sentence, explaining why Smith's sentence had to be at least twenty years. The probation officer inquired whether the district court was ruling that Smith's statutory maximum sentence was twenty years, and the court responded, "Yes." The probation officer then explained these two problems: (1) that even with a twenty-year statutory maximum penalty, Smith's offense level under U.S.S.G. § 4B1.1 was still 32, and (2) that Smith's offense level 32 and criminal history category VI resulted in a guideline range of

16

210 to 262 months with a cap of 240 months because of the twenty-year statutory maximum under 21 U.S.C. § 841(b)(1)(C). The probation officer explained to the court that a 120-month term of imprisonment for a criminal history category VI offender would be justified only if the offense level was 26.

After the probation officer's comments, Smith's counsel interjected another approach: the court could downwardly depart based on Smith's diminished capacity and his minor role in the offense. The probation officer responded that a minor role adjustment did not apply because Smith was designated a career offender. The government also argued in reply that a diminished-capacity departure did not apply to reduced mental capacity caused by voluntary use of drugs, that there was no psychiatric evaluation or doctor's testimony, and that Smith was competent to testify at trial. Nonetheless, the district court then reduced Smith's base offense level by six levels, from level 32 to level 26, for diminished capacity resulting from Smith's drug addiction and prior emotional disturbances. The court did not rule on minor role at this juncture.

Apparently determining Smith's statutory maximum penalty was twenty years under 21 U.S.C. § 841(b)(1)(C), the district court found that his base offense level was 32 as a career offender under U.S.S.G. § 4B1.1. Thus, in imposing a 120-month sentence at the sentencing hearing, the district court appears to have

used a criminal history category VI and an offense level of 26, which yields a guideline range of 120 to 150 months. After the government objected to the six-level downward departure, the court concluded by stating "This will make for an interesting appellate review."

**F.    Order on Motion for Downward Departure**

A month after Smith's sentence was imposed, the district court published a "Corrected Order on Motion for Downward Departure," wherein the court changed part of its reasoning for the 120-month sentence. United States v. Smith, 125 F. Supp. 2d 486 (S.D. Fla. 2000).[10]  In that Corrected Order, the district court again recognized that "[i]t is not disputed that as a career offender Smith's criminal history category is VI." Id. at 489.  Instead, the court's order focused on what offense level should apply under the Sentencing Guidelines when the government fails to charge, and a jury makes no finding, as to drug quantity. This time the court started with a base offense level of 34 and reduced it eight levels to level 26.

In the interim, the court evidently had decided that Smith's offense statutory maximum penalty was thirty years (instead of twenty years) under 21 U.S.C. § 841(b)(1)(C) and that his offense level was 34 (instead of 32) under the career

---

[10] On October 25, 2000, the district court issued its first "Order on Motion for Downward Departure." On November 9, 2000, the district court issued its "Corrected Order on Motion for Downward Departure," which was published.

offender guideline, U.S.S.G. § 4B1.1.  At the same time, the court in its Corrected

Order also found that Smith was far less culpable than Jackson and was entitled to

a minor role adjustment of two levels under U.S.S.G. § 3B1.2(b) (1998).  Smith,

125 F. Supp. 2d at 490. The court thus reduced Smith's offense level from 34 to

32.  Id.  The sentencing range for offense level 32 and a criminal history category

VI is 210 to 262 months.  U.S.S.G. ch. 5, pt. A (1998).  After acknowledging this

guideline range, the court's Corrected Order states that "[i]f it is determined that

further downward adjustments are not permitted, the sentence imposed would be

210 months."  Smith, 125 F. Supp. 2d at 490.

In its Corrected Order, the district court also expanded its reasons for

downwardly departing an additional six levels.  The court stated its belief that the

seriousness of prior offenses "cannot be considered here for criminal history

purposes because U.S.S.G. § 4B1.1 mandates that a career offender shall be

Category VI without regard for the seriousness of the prior offenses."  Id. at 491.

However, the district court concluded that the nature of the prior offenses that

made Smith a career offender could be considered along with other circumstances

in departing downward from Smith's offense level.  In departing downward, the

district court thus considered the following circumstances:  (1) "the nature of the

offenses which makes Smith a career offender," (2) "his impaired ability to control

his behavior," (3) "the circumstances of his involvement in the offense," (4) his "mostly nonviolent criminal history," and (5) "the drastic disparity in sentences of more culpable offenders." Id. The court determined that there is a "confluence of circumstances in this case, none of which standing alone may have warranted departure, but are present to an unusual degree, which distinguishes this case from the 'heartland' cases covered by the guidelines." Id. As a result, the district court granted a six-level downward departure from offense level 32 to 26, which with a criminal history category VI resulted in a guideline range of 120-150 months.

The government timely appealed Smith's 120-month sentence. Smith timely cross-appealed his drug conspiracy conviction.

## II. CONVICTION

We first conclude that the evidence was sufficient to sustain Smith's drug conspiracy conviction under 21 U.S.C. § 841(a)(1).[11] To support a conspiracy conviction, the government must prove "(1) an agreement between the defendant

---

[11] Smith did not cross-appeal his separate conviction for possession with intent to distribute cocaine. Whether sufficient evidence was presented at trial to support Smith's drug conspiracy conviction is a question of law subject to de novo review. See United States v. Diaz, 248 F.3d 1065, 1084 (11th Cir. 2001). "This Court reviews the sufficiency of the evidence to determine whether a reasonable jury could have concluded that the evidence established a defendant's guilt beyond a reasonable doubt. The evidence is viewed in the light most favorable to the government and all reasonable inferences and credibility choices are made in the government's favor." Id.

and one or more persons, (2) the object of which is to do either an unlawful act or a lawful act by unlawful means." United States v. Toler, 144 F.3d 1423, 1426 (11th Cir. 1998). The existence of the conspiracy and the defendant's participation in it may be established through circumstantial evidence. Id.

We disagree with Smith's contention that the government failed to prove a conspiracy between himself and Jackson. When Ruff and Tucker, the ostensible drug purchasers, reported to the location where they had been sent by co-defendant Jackson, Smith was waiting instead of Jackson. Smith excused Jackson's failure to appear and offered to attempt to obtain the drugs for them. Tucker explained that he believed Jackson was reluctant to deal with Ruff and Tucker directly because Jackson did not know Ruff. Smith subsequently negotiated with Ruff and Tucker for the quantity of crack cocaine that they had specified (two ounces) at the price that they had agreed to pay ($1,875). To consummate the actual drug delivery, Smith took Tucker and Ruff's money, left and got into what Tucker recognized as Jackson's car, and drove away. When Smith returned, he showed Ruff and Tucker the crack cocaine which he had concealed inside his pants and gave it to them. Jackson's thumbprint was found on the plastic bag housing the crack cocaine, the same plastic bag that Smith had concealed in his pants before handing it to Ruff.

Indeed, Smith testified that he had obtained the crack cocaine from co-defendant Jackson on April 21 for the purpose of delivering it to Tucker and Ruff.

From this evidence, a reasonable trier of fact could find that Smith was acting as co-defendant Jackson's agent and had dealt with Ruff and Tucker directly based upon Jackson's reluctance to sell drugs to Ruff, with whom he was not acquainted. The jury was entitled to draw the reasonable inference that Smith's trip with Jackson in Jackson's car, at the critical time of the drug delivery, was for the sole purpose of procuring the crack cocaine for Smith to deliver to Tucker and Ruff. Smith's excuse – that he was to be paid one 8-ball of crack cocaine for his efforts – does not detract from the validity of the jury's conclusion that Smith had conspired with Jackson to provide crack cocaine for Tucker and Ruff.

Furthermore, the district court included in its jury charge the caveat that, before finding Smith guilty of the conspiracy offense, the jury was required to find that Smith had conspired with Jackson, and not with Tucker and Ruff, to possess crack cocaine with the intent to distribute it. This jury charge necessarily precluded the jury from finding Smith guilty of conspiracy without having found that he had entered into an illegal agreement with co-defendant Jackson.[12]

---

[12] Smith relies upon United States v. Mercer, 165 F.3d 1331 (11th Cir. 1999), but the facts in that case are distinguishable. In Mercer, a co-defendant simply told an informant where the defendant could be located and that he could provide drugs.

22

In sum, there was sufficient evidence for the jury to convict Smith of the drug conspiracy charge.[13]

## III. SENTENCE

On appeal, both parties start with the premise that the statutory maximum penalty for Smith's drug conspiracy conviction is thirty years under 21 U.S.C. § 841(b)(1)(C) because of his prior felony drug convictions. Thus, we begin with that starting point as well.[14] Proceeding on that basis, the government raises two

The co-defendant, however, refused to assist the informant in contacting the defendant or in accompanying him to visit the defendant. Id. at 1333-34. The court determined that there was no evidence of any agreement between the defendant and the co-defendant and that the co-defendant's recommendation of the defendant as a source for drugs did not amount to a common design or purpose, thereby defeating the conspiracy charge. Id. at 1334-35.

[13] In its Corrected Order, the district court discussed the report Punishment and Prejudice: Racial Disparities in the War on Drugs, 12 Human Rights Watch 2(G) (May 2000), § VI. Smith, 125 F. Supp. 2d at 488 n.1. In discussing this report, the district court appears to be taking judicial notice of this report and suggesting that race may have played a role in the defendant Smith's arrest for a drug crime. The parties, however, did not raise any issue as to racial profiling. In any event, this report is not the proper subject of judicial notice. See Fed. R. Evid. 201(b); Shahar v. Bowers, 120 F.3d 211, 214 (11th Cir. 1997) (listing scientific, geographical, and historical facts as the types of facts of which courts ordinarily take judicial notice). Accordingly, the district court erred in both raising the issue sua sponte and in discussing this report.

[14] On appeal the government concedes an Apprendi error in this case and no longer seeks a mandatory minimum life sentence under 21 U.S.C. § 841(b)(1)(A), as it originally did in the district court. The government's brief states, "[b]ecause the indictment failed to charge drug quantity and because the jury was not asked to make a determination of drug quantity, Smith's sentence was required to be calculated without reference to drug quantity." (Appellant's Br. at 34). Thus, we expressly do

23

errors: (1) that the court erred in not imposing a mandatory minimum sentence of thirty years under 21 U.S.C. §§ 841(b)(1)(C) and 851; and (2) that the court erred in vertically departing downward six offense levels based on the non-violent nature of Smith's criminal history, his diminished capacity, and the disparity between Smith's sentence and those of Tucker, Ruff, and others caught in the BSO sting.

## A.     Mandatory Minimum Sentence

As to the first issue, we reject the government's contention that the district court was required to impose a mandatory minimum sentence of thirty years under 21 U.S.C. §§ 841(b)(1)(C) and 851.  The government did timely file its § 851 enhancement regarding Smith's prior felony convictions.  In addition, his prior felony drug convictions did increase Smith's statutory maximum penalty from twenty to thirty years under § 841(b)(1)(C) without taking drug quantity into account.  U.S.S.G. § 4B1.1, cmt. n.2 (1998) (giving as an example of the "offense statutory maximum" the case where a statutory maximum term under

---

not address whether there was any error under <u>Apprendi</u> or whether a mandatory life sentence under § 841(b)(1)(A) was applicable here.  Specifically, we do not address whether Smith's own testimony at trial that he had 55.6 grams of crack cocaine, along with the lab report and the officer's testimony establishing that same drug quantity, in effect, proved drug quantity beyond a reasonable doubt and pretermitted any <u>Apprendi</u> problem.  Without an <u>Apprendi</u> issue and with a drug quantity of 55.6 grams of cocaine base and Smith's two prior felony drug convictions, Smith's statutory mandatory minimum penalty for these drug convictions would become life imprisonment under § 841(b)(1)(A).

24

§ 841(b)(1)(C) is thirty years due to prior drug convictions); United States v.

Acevedo, ___ F.3d ___, ___, No. 00-12175 (11th Cir. March 15, 2002). But

§ 841(b)(1)(C) does not impose a mandatory minimum sentence of thirty years; it

only enhances Smith's sentence to a term of imprisonment "of not more than 30

years," as follows:

> If any person commits such a violation after a prior
> conviction for a felony drug offense has become final,
> such person shall be sentenced to a term of imprisonment
> of not more than 30 years . . . .

21 U.S.C. § 841(b)(1)(C). Thus, even under the government's premise, Smith

faced a sentence "of not more than 30 years," but not a mandatory minimum

sentence of thirty years under § 841(b)(1)(C).

## B. Vertical Downward Departure From Offense Level

As to the second issue, we agree with the government that the district court

abused its discretion in departing downward as to Smith's offense level. None of

the factual circumstances relied on by the district court are permissible grounds for

a vertical downward departure from Smith's offense level in this case.[15]

---

[15] This Court reviews de novo a district court's interpretation of the sentencing guidelines. United States v. Pinion, 4 F.3d 941, 943 (11th Cir. 1993). We review a district court's decision to depart from the Sentencing Guidelines for abuse of discretion. Koon v. United States, 518 U.S. 81, 91 (1996). This abuse of discretion standard "includes review to determine that the discretion was not guided by erroneous legal conclusions." Id. at 100; see also United States v. Rucker, 171 F.3d

Before addressing the downward departure, we review where the district court began before granting the departure. In its Corrected Order, the court recognized that Smith was a career offender under U.S.S.G. § 4B1.1 and "that as a career offender Smith's criminal history category is VI." Smith, 125 F. Supp. 2d at 489. As to Smith's base offense level, the district court's Corrected Order began with level 34 under the career offender guideline in U.S.S.G. § 4B1.1.[16] 125 F. Supp. 2d at 489. The court then found that Smith was "entitled to mitigating role adjustment pursuant to U.S.S.G. § 3B1.2(b)" and reduced his offense level from 34 to 32.[17] Id. at 490. The court noted that "[a]t level 32 the sentencing range is 210-262 months" and concluded that "[i]f it is determined that further downward adjustments are not permitted the sentence imposed would be 210 months." Id.

Because the government has not appealed these findings, we address only whether the court's downward departure from offense level 32 to 26 was permitted

1359, 1361 (11th Cir. 1999).

[16] Because the government abandoned its effort to obtain a life sentence based on drug quantity, see note 15 supra, and conceded that the statutory maximum penalty for Smith's drug offense was 30 years under 21 U.S.C. § 841(b)(1)(C), Smith's base offense level is level 34 pursuant to the offense level table in U.S.S.G. § 4B1.1.

[17] In the district court, the parties disputed whether a minor role adjustment was inapplicable as a matter of law when a defendant is a career offender under U.S.S.G. § 4B1.1. See United States v. Delvecchio, 920 F.2d 810, 813 & n.4 (11th Cir. 1991). Because the government has not raised that minor role issue on appeal, we expressly do not address it.

under the Sentencing Guidelines.  We discuss in turn the court's three departure grounds: (1) Smith's criminal history, (2) his diminished capacity, and (3) the circumstances of Smith's involvement in this offense and the disparity in sentences of other defendants caught in the same sting.

## C.    Criminal History

In departing down six offense levels on the vertical axis, the district court found that "Smith's criminal history category significantly overrepresents the seriousness of his criminal history." Smith, 125 F. Supp. 2d at 490.  The court noted that U.S.S.G. § 4A1.3 usually permits the court to depart downward when criminal history is significantly overrepresented, but concluded that this criminal history factor cannot be considered here "because U.S.S.G. § 4B1.1 mandates that a career offender shall be Category VI without regard for the seriousness of the prior offenses." Id. at 491.

The court then concluded that the guidelines, however, did not prohibit considering this criminal history factor, along with other circumstances, in departing downward as to offense level under U.S.S.G. § 5K2.0.  Therefore, in departing downward from offense level 32 to 26, the district court considered "the nature of the offenses which makes Smith a career offender" and Smith's "mostly nonviolent criminal history."   125 F. Supp. 2d at 491.  The district court

27

emphasized that "[e]xcept for his involvement in the 1994 gang-type robbery when he was 21-years old all of the defendant's convictions have been for non-violent offenses including loitering, petite theft, possession of controlled substances and traffic violations." Id. at 490. The court stated further that the likelihood of recidivism "is less a factor where the prior offenses are minor, the offender is youthful and a reduced sentence would still be a lengthy one." Id. at 490-91.

The district court erred in its analysis for three reasons. First, the departure here based on criminal history must proceed under U.S.S.G. § 4A1.3 and not U.S.S.G. § 5K2.0. Second, downward departures under U.S.S.G. § 4A1.3 must be on the horizontal axis, reflecting the offender's criminal history category, and not on the vertical axis, reflecting his offense level. Third, and in any event, the facts do not support the court's conclusion that Category VI significantly overrepresents the seriousness of Smith's criminal history and thus do not support a U.S.S.G. § 4A1.3 downward departure even on the horizontal axis. We discuss guided departures, the different axes, and then Smith's criminal history.

1.      Criminal History Departure Must Be Under U.S.S.G. § 4A1.3, not U.S.S.G. § 5K2.0

This Court has noted the Sentencing Guidelines distinction between guided and unguided departures. United States v. Collins, 915 F.2d 618, 620 (11th Cir. 1990) (quoting U.S.S.G. Introduction, ¶ 4(b) at 1.7); United States v. Fayette, 895

28

F.2d 1375, 1377 (11th Cir. 1990) (same). Guided departures are those departures specifically provided for in the Guidelines. Unguided departures proceed under U.S.S.G. § 5K2.0, which allows for a departure from the prescribed guideline range when "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." U.S.S.G. § 5K2.0 (1998) (quoting 18 U.S.C. § 3553(b)).

Because U.S.S.G. § 4A1.3 explicitly contemplates departures from criminal history category based on likelihood of recidivism, we have previously held that "any departure made on the ground that the defendant is unlikely to commit crimes in the future must be made under the guided departure procedure outlined in § 4A1.3," rather than under U.S.S.G. § 5K2.0's unguided departure. Collins, 915 F.2d at 621. We have also held that U.S.S.G. § 4A1.3 is intended to include, and thus adequately accounts for, the defendant's commission of additional offenses after his guilty plea, rendering a departure under U.S.S.G. § 5K2.0 inappropriate. Fayette, 895 F.2d at 1379-80.

In this case, the district court based its decision to depart as to criminal history on its finding that Smith's criminal history was overrepresented. 125 F. Supp. 2d at 490. Because overrepresentation, like recidivism, was both explicitly

29

and adequately considered by the Sentencing Commission in formulating U.S.S.G. § 4A1.3, we conclude that the only permissible basis for a criminal history departure based on overrepresentation in this case was under U.S.S.G. § 4A1.3, and not under U.S.S.G. § 5K2.0.

2.    U.S.S.G. § 4A1.3 Departures Based on Criminal History Proceed on Only the Horizontal Axis

In addition, any departure based on criminal history in this case should have proceeded on only the horizontal axis. This Court repeatedly has distinguished between "horizontal" and "vertical" departures under the Guidelines. See, e.g., United States v. Taylor, 88 F.3d 938, 947-48 (11th Cir. 1996); United States v. Mogel, 956 F.2d 1555, 1559-62 (11th Cir. 1992). "Horizontal departures are increases or decreases based on the relevant criminal history category applicable to the defendant." Taylor, 88 F.3d at 947. "Vertical departures are increases or decreases based on the offense level." Id.

More specifically, § 4A1.3 departures must proceed on only the horizontal axis and not the vertical axis. See, e.g., Mogel, 956 F.2d at 1558-60 ("[T]he Guidelines provide that a judge, in departing on the mentioned ground [inadequately reflected criminal history], should determine a more appropriate

30

sentence by moving along the horizontal, i.e., the offender-based axis.").[18]  Indeed, the policy statement for U.S.S.G. § 4A1.3 explicitly states that "[i]n considering a departure under this provision, the Commission intends that the court use, as a reference, the guidelines range for a defendant with a higher or lower <u>criminal history category</u>, as applicable."  U.S.S.G. § 4A1.3 (1998) (emphasis added).  In departing under U.S.S.G. § 4A1.3, the district court must discuss each criminal history category it passes over en route to the category that adequately reflects the defendant's past criminal conduct.  <u>See, e.g.</u>, <u>United States v. Dixon</u>, 71 F.3d 380, 382 (11th Cir. 1995);[19] <u>United States v. Johnson</u>, 934 F.2d 1237, 1239 (11th Cir. 1991); <u>Collins</u>, 915 F.2d at 620-21.

---

[18] <u>See also</u> <u>United States v. Pickering</u>, 178 F.3d 1168, 1175 (11th Cir. 1999) (specifically analogizing a post-offense rehabilitation departure to a downward departure based on an overstated criminal history category, and concluding, "any downward departure for post-offense rehabilitation must occur along that axis"); <u>United States v. Mesa</u>, 247 F.3d 1165, 1170 (11th Cir. 2001) (applying <u>Pickering</u> to hold that any departure for post-offense rehabilitation must occur along the criminal history axis).

[19] In <u>Dixon</u>, we "recognized [that] there is an important distinction between upwardly departing from criminal history categories below VI and above VI."  71 F.3d at 382.  We further concluded that when a court departs under U.S.S.G. § 4A1.3, "the established procedure . . . requires the sentencing court to discuss each category it passes over en route to the category that adequately reflects the defendant's past criminal conduct."  <u>Id.</u>  We determined that such a careful procedure was not required for vertical, or offense level, adjustments under U.S.S.G. § 4A1.3 once the court had reached Category VI.  <u>Id.</u>; <u>see also</u> <u>Taylor</u>, 88 F.3d at 947-48 (extending this rule to all vertical adjustments).

There is one exception to this general rule that U.S.S.G. § 4A1.3 departures based on criminal history must proceed on only the horizontal axis. That exception is only for <u>upward</u> departures above criminal history category VI. In this same policy statement, the Commission provides that an upward departure may be made above the relevant guideline range for criminal history category VI and that in making such departure, the court "structure[s] the departure by moving incrementally down the sentencing table to the next higher <u>offense level</u> in Criminal History Category VI until it finds a guideline range appropriate to the case." U.S.S.G. § 4A1.3 (emphasis added). The policy statement then provides, "However, this provision is not symmetrical. . . . Therefore a departure below the lower limit of the guideline range for Criminal History Category I on the basis of adequacy of criminal history cannot be appropriate." <u>Id.</u> Thus, U.S.S.G. § 4A1.3 <u>upward</u> departures based on underrepresented criminal history can be made above category VI on the vertical axis in certain circumstances. In contrast, U.S.S.G. § 4A1.3 <u>downward</u> departures based on underrepresented criminal history are only on the horizontal axis, must stop at category I, and may not then proceed vertically.

These U.S.S.G. § 4A1.3 departure rules also apply even when the defendant is a career offender under U.S.S.G. § 4B1.1. This Court has concluded that the district court has authority under U.S.S.G. § 4A1.3 to exercise its discretion to

depart downward with respect to a defendant who is a career offender under U.S.S.G. § 4B1.1. United States v. Webb, 139 F.3d 1390, 1395 (11th Cir. 1998) (concluding that "§ 4A1.3 does authorize the sentencing court to downward depart regardless of a defendant's status as a career offender under § 4B1.1"); United States v. Gilbert, 138 F.3d 1371, 1372-73 (11th Cir. 1998) (concluding that "Gilbert was properly sentenced as a career offender" and that "Gilbert is correct that the district court could have departed downward if it had found Gilbert's criminal history to be overrepresented" under U.S.S.G. § 4A1.3, but deciding that "the record does not reveal such a finding").[20] Thus, even though Smith was a

---

[20]    In Webb, this Court stated that "[i]n vacating Webb's sentence and remanding this case for resentencing, we decide, in an issue of first impression in this circuit, that a district court has the authority under the Sentencing Guidelines to exercise its discretion to grant a request for downward departure with respect to a defendant who has been classified as a career offender." 139 F.3d at 1390-91. Webb distinguished our prior decision in United States v. Gonzalez-Lopez, 911 F.2d 542 (11th Cir. 1990), which had rejected a downward departure for a career offender. Webb pointed out that this Court's rejection of the departure in Gonzalez-Lopez "was based solely on our determination that the court's stated reasons for departing downward did not support such a departure." Webb, 139 F.3d at 1396 n.5. In Gonzalez-Lopez, we also had concluded that a sentencing court may not consider the underlying facts of a prior conviction (a) to determine whether it is a "crime of violence," as defined in U.S.S.G. § 4B1.2 and used in U.S.S.G. § 4B1.1, or (b) in departing downward in career offender cases. 911 F.2d at 550. Gonzalez-Lopez stated, "we hold that based upon the facts of this case, the sentencing court was precluded from departing from the career offender guideline." Id. at 551.
    Although Webb distinguished Gonzalez-Lopez, there is some tension in our cases. Compare United States v. Webb, 139 F.3d 1390, 1395 (11th Cir. 1998) (§§ 4A1.3 and 4B1.1) with United States v. Rucker, 171 F.3d 1359, 1361-64 n.7 (11th Cir.

career offender, the district court had authority to depart downward under § 4A1.3 but only on the horizontal axis.[21]

### 3. Category VI Did Not Overrepresent Smith's Criminal History

Although misapprehending which axis applied, the district court nonetheless did exercise its discretion to depart downward and stated why it found the seriousness of Smith's criminal history was overstated. In addition to the axis problem, the district court also abused its discretion in finding that the seriousness of Smith's criminal history was overrepresented.

There are several reasons why this is so. First, the district court relied on the fact that except for one robbery in 1994, Smith's criminal history included four cocaine possessions and certain non-violent offenses including loitering, petit theft and traffic violations. But Smith also had a fifth drug conviction, which was possession with intent to distribute cocaine. Indeed, the two offenses that made Smith a career offender under U.S.S.G. § 4B1.1 were his convictions for

_____

1999) (§§ 4A1.3 and 4B1.4). We need not resolve that tension because we conclude that even though the district court here had the authority to depart downward under U.S.S.G. § 4A1.3 in this career offender case, the facts regarding Smith's criminal history do not show his criminal history category VI was overrepresented and do not support a downward departure from that category.

[21] The government acknowledges that U.S.S.G. § 4A1.3 departures based on an overrepresented criminal history category "pertain equally to defendants who are sentenced under the career offender guideline." (Appellant's Brief, p.40).

possession of cocaine with intent to deliver in 1990 and his robbery with a deadly weapon in 1994. Second, even without the career offender designation in U.S.S.G. § 4B1.1, Smith's 19 criminal history points easily placed him in category VI. Specifically, his six prior state felonies, two misdemeanors, and this federal offense being committed within two years of release from imprisonment gave Smith 19 criminal history points, six more points than the thirteen needed to place him in category VI. See U.S.S.G. § 4A1.1.

Third, the policy statement for U.S.S.G. § 4A1.3 is concerned with the pattern or timing of prior convictions, and not with the facts of the individual prior crimes as relied upon by the district court. See United States v. Rucker, 171 F.3d 1359, 1360, 1363 & n.8 (11th Cir. 1999) (reversing downward departure where stated basis for departure was that the prior crimes involved small amounts of drugs and were therefore "very minor"); United States v. Phillips, 120 F.3d 227, 231-32 (11th Cir. 1997) (reversing downward departure from criminal history category VI to III, rejecting defendant's contention that the circumstances surrounding a prior conviction can be considered in U.S.S.G. § 4A1.3 departures, and stating the U.S.S.G. § 4A1.3 policy statement "is concerned with the pattern or

35

timing of prior convictions").[22]  Here, the district court improperly relied upon the non-violent nature of Smith's prior individual crimes as opposed to examining the timing and pattern of those convictions.  Moreover, the timing and pattern of Smith's prior offenses do not warrant a downward departure in any event.  Indeed, for almost a decade, Smith repeatedly has committed either state felonies or misdemeanors.  Smith's federal offense also occurred within two years of his release from state imprisonment.  Finally, U.S.S.G. § 4A1.3 permits a downward departure where "a defendant's criminal history category significantly over-represents the seriousness of a defendant's criminal history."  (Emphasis added).

Neither the reasons given by the district court, nor any other facts in this record, are sufficient to show that the seriousness of Smith's criminal history category VI was significantly overrepresented.  Thus, for all of these reasons, the district court erred in departing on this basis.

**D.    Diminished Capacity**

As another departure ground, the district court stated that it believed Smith's judgment was impaired by a number of factors, including drug abuse, a low

---

[22] In Phillips, this Court noted that the proper focus of U.S.S.G. § 4A1.3 "is evident in the illustrative situation described in the guideline: 'An example might include the case of a defendant with two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period.'"  120 F.3d at 232.

aptitude or learning disability leading to classification as a special education student, and "early treatment for an emotional or mental disorder." Smith, 125 F. Supp. 2d at 491. This was also an improper ground for departure.

As discussed above, this Court has noted the distinction between guided departures and U.S.S.G. § 5K2.0 unguided departures. The Guidelines specifically prohibit the offender characteristics noted by the district court from ordinarily being a basis for departure outside the applicable guideline range. Sections 5H1.1-6 list a number of examples of factors which may figure into sentencing decisions within a Guideline range, but are "not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. ch. 5, pt. H, introductory cmt. (1998). They include (1) education and vocational skills (§ 5H1.2), (2) mental and emotional conditions (§ 5H1.3), and (3) physical condition, including drug or alcohol dependence or abuse (§ 5H1.4). While the Guidelines "do not categorically prohibit a judge from departing on the basis of offender-related characteristics," we have held that the policy statements of U.S.S.G. §§ 5H1.1-6 "prohibit[ ] departures from the applicable sentence range in all but extraordinary cases," i.e., all but departures under U.S.S.G. § 5K2.0. Mogel, 956 F.2d at 1561-62. Yet there is nothing in this record about Smith's drug addiction or his mental and emotional condition that makes this case so

extraordinary as to take it out of the "heartland" and to support a U.S.S.G. § 5K2.0 departure.

In addition, U.S.S.G. § 5K2.0 departures based on diminished capacity are further restricted by U.S.S.G. § 5K2.13. See United States v. Russell, 917 F.2d 512, 516-17 (11th Cir. 1990). Section 5K2.13 provides that "a sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity." U.S.S.G. § 5K2.13 (1998). Moreover, this departure based on mental capacity is not permitted when "the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants." Id. There is no record evidence that Smith's mental capacity was "significantly reduced."

In sum, we find that Smith's disabilities, separately or in combination, were insufficient as a matter of law to support a departure from the guideline range on the basis of diminished capacity.

## E. Disparity in Sentences

As another ground for departure, the district court noted that the other suspects caught in the investigation of Smith's neighborhood "were all more culpable than Smith," and yet, because they had pled guilty, they received "significantly reduced sentences." Smith, 125 F. Supp. 2d at 491. In particular,

Tucker was never charged since he was a paid informant, and Ruff received a sentence reduction to two years in prison. This also was not an appropriate basis for departure under U.S.S.G. § 5K2.0.

In United States v. Chotas, 968 F.2d 1193 (11th Cir. 1992), this Court concluded that "the Sentencing Commission fully anticipated sentencing disparity between defendants involved in the same offense," so to adjust a sentence for that reason without specifying a factor not adequately considered by the Guidelines is impermissible. Id. at 1197-98. Moreover, "to adjust the sentence of a co-defendant in order to cure an apparently unjustified disparity between defendants in an individual case will simply create another, wholly unwarranted disparity between the defendant receiving the adjustment and all similar offenders in other cases." Id. at 1198. Therefore, it was inappropriate as a matter of law for the district court to depart under U.S.S.G. § 5K2.0 on the basis of an alleged disparity between the sentence Smith received and the sentences of Tucker and Ruff.

## F. Confluence of Circumstances

We acknowledge that the district court found that "none of [these circumstances] standing alone may have warranted departure, but are present to an unusual degree which distinguishes this case from the 'heartland' cases covered by the guidelines." Smith, 125 F. Supp. 2d at 491. The combination of these

circumstances, however, is no more a reason for departure in this case than each of the district court's reasons taken separately.

The Commission did envision the possibility of U.S.S.G. § 5K2.0 departure in the "extraordinary case that, because of a combination of such [ordinarily irrelevant] characteristics or circumstances, [the case] differs significantly from the 'heartland' cases covered by the guidelines . . ., even though none of the characteristics or circumstances individually distinguishes the case." U.S.S.G. § 5K2.0 cmt. background (1998). However, the Commission went on to say that it "believes that such cases will be extremely rare." Id.

Given that none of the stated bases for departure – criminal history, diminished capacity due to drug abuse, and sentencing disparity – are permissible grounds for a U.S.S.G. § 5K2.0 departure at all in this case, it would be incongruous to say that the combination of these impermissible departure grounds nevertheless warrants a departure. Thus, we reject the district court's determination that a departure based on a "confluence of circumstances" was warranted.

## IV. CONCLUSION

For the foregoing reasons, we affirm Smith's conviction, but reverse and vacate the 120-month sentence the district court imposed. The district court has

already conducted thorough hearings, found that the guideline range is 210 to 262 months, and concluded "[i]f it is determined that further downward adjustments are not permitted the sentence imposed would be 210 months." <u>United States v. Smith</u>, 125 F. Supp. 2d 486, 490 (S.D. Fla. 2000). We have determined the downward adjustments were not permitted. Therefore, we direct the district court to impose a 210-month sentence without holding a new sentencing hearing.

**AFFIRMED in part; REVERSED, VACATED and REMANDED in part.**