[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-14691

_____

D.C. Docket No. 2:14-cr-00135-SPC-CM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

LESLIE CHIN,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 31, 2018)

Before TJOFLAT, ROSENBAUM, and BRANCH, Circuit Judges.

PER CURIAM:

Following a jury trial, Leslie Chin was convicted of cocaine-trafficking

charges. He appeals the denial of his motion for judgment of acquittal and motion

for a new trial based on newly discovered evidence. Chin also appeals his sentence, arguing that it is substantively unreasonable and creates a sentencing disparity between him and one of his co-defendants. For the reasons that follow, we affirm.

## I.

In December 2014, a grand jury charged Chin and two co-defendants with conspiracy to possess cocaine with the intent to distribute it, in violation of 21 U.S.C. § 846 (Count I), and possession of cocaine with the intent to distribute it, in violation of 21 U.S.C. § 841(a) and (b) (Count II). Both co-defendants pled guilty to the conspiracy charge, but Chin pled not guilty and went to trial.

At trial, the Government presented a number of witnesses. Among others, Harold Coleman, one of Chin's co-conspirators, testified. Coleman explained that he knew Chin by his nickname "Bless" and that he introduced him to co-defendant Jerome Vaughn, who was looking to make some money selling cocaine. He further recounted a March 2012 trip he took with Vaughn to Atlanta, Georgia, with $20,000 to $30,000 in tow to buy cocaine from Chin. About a week after that trip, Coleman stated, he met with Chin and Vaughn in Sumter, South Carolina, and they

distributed 1 "key"[1]—36 ounces—of cocaine Chin had brought with him to sell. According to Coleman, Chin charged about $1,000 per ounce.

Coleman testified that Chin went to Sumter two or three more times over a six- to eight-month period, bringing with him two to three keys of cocaine each time. But Sumter was not the only place Coleman saw Chin. Coleman also traveled to Atlanta periodically to buy drugs from Chin. In Atlanta, on between 20 and 30 occasions, Coleman bought cocaine at an apartment, and he saw Chin there about 10 of those times.

Coleman explained that Chin contacted Coleman and Vaughn when he had a supply of cocaine, and they would arrange a specific time for Coleman to come to Atlanta to purchase the cocaine, usually two to three times a month. As Coleman recalled, he received about 20 keys of cocaine from Chin over the period they dealt in both Atlanta and Sumter. Coleman often pooled money with two or three people to buy from Chin because Chin would never sell less than one key at a time.

Besides recounting his drug-trading interactions with Chin, Coleman also testified about two Florida arrests Chin told him about. In the first instance, Chin said he was driving someone to the airport when police stopped them and found a

---

[1] A kilogram of cocaine is made up of 35.274 ounces. "Key" is generally considered a reference to "kilogram" when used in the context of discussing cocaine. *Kilo (or Key)*, Urban Dictionary, https://www.urbandictionary.com/define.php?term=Kilo%20%28or%20Key%29 (last visited May 25, 2018).

gram of cocaine in his car, which he had forgotten to drop off before going to the airport. Chin was charged, and the police confiscated about $80,000 to $90,000 he had with him, which Chin said he was sending to Atlanta through a flight attendant who was a friend of his.

The second Florida incident occurred when the police stopped Chin on his way to court. Chin was driving his brother's car with "stash boxes" in it: the air bag had been removed and placed under the spare tire in the trunk to accommodate storage for drugs.

Another witness, Gary Williams, confirmed these two stories. Williams identified Chin in the courtroom and testified that they met while housed in the same pod in the Charlotte County Jail. During that time, Chin said he used to hide cocaine in compartments in cars and while he was in Florida, he was pulled over in a car with a hidden compartment inside it.

To further corroborate the story about the first traffic stop, the Government called Florida Highway Patrol Officer Christopher Adkinson to testify. Adkinson recalled that on September 21, 2011, when he conducted the traffic stop on Chin, Chin stepped out of the vehicle upon the Officer's request, gave him his driver's license, and told him he was headed to Fort Myers airport. When the Officer went to get the registration documents from the car, the passenger seated inside, Brian Dicks, jumped out unrequested. Dicks donned a blue flight-attendant uniform and

4

identification patch, and Adkinson testified that the passenger was "a little nervous and began to fidget with the outer coat jacket, at which point I observed a large bundle of cash in the left pocket of the passenger's jacket." Dicks had $7,000 in cash on him. And Adkinson became more suspicious when Chin reached for his registration papers and placed them on the floorboard instead of on the passenger's seat.

At that point, Adkinson called for back-up. Once the additional officers arrived, a police K-9 sniffed around the car and alerted Adkinson to the presence of drugs. He and another officer then searched the car and found a small, clear, plastic bag containing three smaller bags of cocaine on the passenger-side floorboard, in plain view, under some registration papers. In the trunk, Adkinson also found luggage with clothes, a flight manual, and a little over $50,000 in cash in bundles. The car was registered to Chin and his then-girlfriend.

Adkinson added that at the time of the stop, he was not aware that either Chin or his passenger was suspected of having any involvement in a drug conspiracy, and he found no drugs or money on Chin's person. Finally, Adkinson agreed he had no reason to believe the passenger was not a real flight attendant.

The Government also entered into evidence a video taken from the patrol car in which Chin and his passenger were placed while the officers conducted their search of Chin's car. In the video, Chin made a call to his brother Andrew, a co-

defendant, and told him that he had "it" in his pocket and that he never would have had that "coke" on him and would have thrown it out the window. He later stated in the video that he was worried the K-9 would smell "the bread" and paraphernalia. Then Chin said he had it in his pocket and threw it to Dicks to get rid of, but Dicks did not touch it. Chin asked his brother for advice on what they should say about the money found in Dicks's bag in the truck.

Turning to the second traffic stop, the Government called Florida Highway Patrol Lieutenant Michael Joseph Gideons, who explained that on April 17, 2012, he pulled Chin's car over for speeding. Chin stepped out the car, nervous and shaking, and gave permission for a search of the vehicle. After a drug dog alerted to the presence of drugs, two back-up officers conducted a search, and Gideons discovered an air bag hidden under the carpeting of the trunk. Gideons then located a panel behind the stereo system, by the dashboard, that lifted off to reveal a hidden compartment where the air bag should have been. Traces of marijuana were found in the compartment, and traces of cocaine were found in the vehicle.

Drug Enforcement Agency Agent Adam Heinlein testified that he had been conducting surveillance on a house Dicks was renting. He had seen various vehicles frequenting the house, moving duffel bags. When Heinlein conducted traffic stops of some of these cars, he discovered they had similar hidden compartments where the air bags should have been, and these compartments were

6

stuffed with large sums of cash.  One such vehicle was registered to Chin's brother Andrew.

In addition to the evidence corroborating Coleman's and Williams's testimony about Chin's prior law-enforcement stops, the Government called co-conspirator Antonio Hill to the stand to testify about the conspiracy.  Hill described two occasions when he traveled with Vaughn to meet Vaughn's new source of cocaine. The first occurred in a mobile home in Sumter, South Carolina.  Hill testified he knew that the person bringing the cocaine used the nickname "Bless." According to Hill, Bless brought about nine ounces of cocaine to the house with another man, Vaughn tested it out, and then Vaughn paid Bless.  The second occasion occurred about a week later and lasted maybe 30 minutes.  This time, Vaughn did not test the cocaine and just paid Bless for it.

Hill was specifically asked whether he recognized the man known as "Bless" as anyone in the courtroom, and he said "no."  He added that he met Bless only twice about five years prior.

Finally, the Government produced numerous photographs taken from Chin's cell phone.  These pictures depicted bundles of money in vacuum-sealed bags, as well as Chin and others, including Vaughn, holding large sums of money.  They also showed Chin at residences where the conspirators stored and distributed drugs.  Besides this physical evidence, the Government presented hotel receipts

7

from Sumter, text messages between Chin and his co-conspirators with meeting and money-transfer instructions, and a handwritten note from Chin indicating that Chin left a $100 cash deposit for Vaughn at a hotel.

After the Government's case-in-chief, Chin filed a motion for judgment of acquittal, and the court denied it.

In his defense, Chin called only one witness, Agent Heinlein, and showed him photographs taken from Chin's phone, including pictures of Chin wearing flashy jewelry. These photographs also showed pictures of fancy cars, scantily clad women, and rappers. Defense counsel sought to bolster his theory that Chin was an aspiring rap artist and that rap music is associated with "bling."

## II.

After a seven-day trial, on March 1, 2016, the jury found Chin guilty of both conspiracy and possession with intent to distribute cocaine. Under Count I, the jury found Chin guilty of the first object of the conspiracy involving the intended distribution of "five or more kilograms of a mixture or substance containing a detectable amount of cocaine" but not guilty of the second and third objects of the conspiracy, respectively, involving the intended distribution of "28 or more grams of a mixture of substance containing a detectable amount of cocaine base, 'crack cocaine'" and "a quantity of a mixture or substance containing a detectable amount of marijuana."

8

At the sentencing hearing, Chin's counsel specifically requested that the court determine a base offense level of 32 and a criminal-history category of V, which would result in an advisory sentencing guideline range of 188 to 235 months.  The Government agreed to both.  The court adopted these standards and noted that supervised release would be five years for Count I and three years for Count II.

Defense counsel then requested a downward variance of 120 to 188 months based on the abuse Chin endured as a child and on the sentence his co-defendant Vaughn, who had pled guilty, had received.  Counsel told the court that if it rejected the downward variance, then "a sentence of 188 months would result in a . . . reasonable and not greater than necessary sentence, given the fact that I think a sentence higher than that would result in a [disparate] sentence with the previous defendant [Vaughn] this Court just sentenced."

After hearing argument from both sides, on June 27, 2016, the court sentenced Chin to 188 months in prison for both counts, to run concurrently, with five years of supervised release for Count I and three years for Count II to run concurrently.

### III.

On September 22, 2016, Chin filed a motion for a new trial based on newly discovered evidence.  He argued that on June 22, 2016, five days before

sentencing, Vaughn's attorney forwarded to Chin's counsel two original letters he had received before the start of Chin's trial in February 2016.  Chin's counsel was allegedly not aware of the letters until after June 22 and verified that the letters were written by Antonio Hill, who had testified against Chin at trial.

In the first letter, Hill wrote that he "didn't know the guy Chin (Bless)," that he mistook him for a different guy, and that in 2011, he never saw Vaughn with "Chin AKA Bless. I don't even know him."  In the second letter, Hill said, "I don't know the guy Lesli[e] Chin AKA Bless. . . . I know Jerome Vaughn but, I can't say that he has ties with Chin."

Chin argued that the letters show Hill perjured himself at Chin's trial, and the letters "exculpated the Defendant."  In Chin's view, had the letters been available at trial, they would have resulted in a not-guilty verdict.

The court denied Chin's motion, noting the "substantial" incriminating evidence presented at trial.  The court further explained that Chin had the opportunity to attack Hill's credibility on the stand, particularly by showing that Hill could not identify Chin in the courtroom, and by eliciting testimony about Hill's hope that testifying would reduce his own sentence.  Ultimately, the district court concluded that the result would have been the same without Hill's testimony at all.

### IV.

Chin argues on appeal that the district court wrongfully denied his motion for judgment of acquittal and wrongfully denied his motion for a new trial. He further asserts that his sentence is substantively unreasonable and creates an unwarranted sentencing disparity between himself and his co-defendant Vaughn. We consider each argument in turn.

**A. The Motion for Judgment of Acquittal**

We review de novo the denial of a motion for judgment of acquittal, viewing the evidence "in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." *United States v. Barsoum*, 763 F.3d 1321, 1329-30 (11th Cir. 2014). After applying this standard to the considerable evidence against Chin, we find that for both Counts I and II, the district court did not err in denying the motion for acquittal.

1. Count I

Under Count I, Chin was charged with knowingly and willfully conspiring to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii)(II), and 21 U.S.C. § 846. To sustain a conviction under these provisions, the United States must establish beyond a reasonable doubt the following elements: (1) an agreement among two or more persons existed; (2) "the defendant knew of the general purpose of the agreement"; and (3) "the defendant

knowingly and voluntarily participated in the agreement." *United States v. Capers*, 708 F.3d 1286, 1299 (11th Cir. 2013) (quoting *United States v. Simpson*, 228 F.3d 1294, 1298 (11th Cir. 2000)).  Chin challenges only the third element—that he knowingly and voluntarily participated in the agreement.

To prove knowing and voluntary participation, the United States "must prove beyond a reasonable doubt that [Chin] had a specific intent to join the conspiracy." *United States v. Calderon*, 127 F.3d 1314, 1326 (11th Cir. 1997), *modified on other grounds*, *United States v. Toler*, 144 F.3d 1423 (11th Cir. 1998). But once the Government has established the existence of the underlying conspiracy, "it only needs to come forward with *slight evidence* to connect a particular defendant to the conspiracy."  *Id.* (emphasis added).  Indeed, we have described the level of necessary proof as a "minimal threshold" and explained that "the conclusion that appellants had a common purpose and plan with the other coconspirators may be inferred from a 'development and collocation of circumstances.'" *Id.*

Among other such circumstances, we have recognized "repeated presence at the scene of the drug trafficking." *Id.*  In fact, we have noted "[t]hat circumstance standing alone can give rise to a permissible inference of participation in the conspiracy.  While not sufficient in and of itself to convict, the inference is 'a material and probative factor that the jury may consider in reaching its verdict.'"

*Id.* (internal citations omitted). Finally, we have acknowledged that even where a defendant's "role is minor in the overall scheme," he may still be convicted of conspiracy. *Id.* (internal citations omitted).

Here, far more than "slight evidence" linked Chin to the conspiracy. First, Chin's co-conspirator Coleman testified that Chin sold him thousands of dollars' worth of cocaine both in Atlanta and Sumter. This testimony, in turn, was corroborated by photographs taken from Chin's cell phone depicting Chin and Vaughn holding large sums of money, photographs showing Chin with co-conspirators at residences where they stored and distributed drugs, text messages with meeting and wire-transfer instructions, and hotel receipts.

But that is not all. Law-enforcement officers testified about their traffic stops of Chin. In one traffic stop, Chin's passenger was found with cocaine and $7,000 on his person as well as $50,000 in his trunk. And in the video of Chin in the back of the patrol car, Chin admitted to possessing the cocaine but then throwing it to his passenger Dicks. He also expressed his concern about what story to concoct about the money in the trunk.

In the second traffic stop, the police discovered a secret compartment in Chin's car where the air bag was supposed to be. That compartment linked Chin's car to a string of other vehicles with the same missing compartment that had frequented a house Dicks was renting.

13

This evidence certainly suffices for the jury to have rejected Chin's theory that he merely associated himself with the wrong people and that he was an aspiring rap artist. Indeed, the jury reasonably inferred that Chin was a voluntary participant in the conspiracy.

For these reasons, the district court did not err in denying the motion for acquittal as it related to Count I.

### 2. *Count II*

Under Count II, Chin was charged with knowingly possessing with intent to distribute cocaine, a Schedule II substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2. To sustain a conviction under § 841(a), the Government must establish the defendant's (1) knowledge, (2) possession of the cocaine, and (3) intent to distribute. *United States v. Mercer*, 541 F.3d 1070, 1076 (11th Cir. 2008) (citing 21 U.S.C. § 841(a)(1)). The Government may prove these three elements by circumstantial or direct evidence. *United States v. Poole*, 878 F.2d 1389, 1391-92 (11th Cir. 1989). Chin argues that the government failed to prove element two—that he was in actual possession of the cocaine found in his vehicle on September 21, 2011.

"Possession may be actual or constructive, joint or sole." *United States v. Woodard*, 531 F.3d 1352, 1360 (11th Cir. 2008) (quoting *United States v. Gunn*, 369 F.3d 1229, 1234 (11th Cir. 2004)). "A defendant has actual possession of a

substance when he has direct physical control over the contraband." *Id.* (quoting *United States v. Edwards*, 166 F.3d 1362, 1363 (11th Cir. 1999)). "A defendant's constructive possession of a substance can be proven by a showing of 'ownership or dominion and control over the drugs or over the premises on which the drugs are concealed.'" *Id.* (quoting *United States v. Clay*, 355 F.3d 1281, 1284 (11th Cir. 2004)); *Poole*, 878 F.2d at 1392 (when drugs were found in defendant's house, possession element was met when defendant exercised dominion and control over the house, even though she did not maintain exclusive control over the premises).

Chin's admission in the video is strong enough evidence that he had actual possession of the cocaine. But additional evidence also shows that Chin at least had constructive possession of the cocaine. As the driver and co-registrant of the vehicle, Chin exercised dominion and control over the car, which supports a finding of constructive possession. *See Poole*, 878 F.2d at 1392.

For these reasons, the district court correctly denied the motion for acquittal as it pertained to Count II.

### B. The Motion for a New Trial

Federal Rule of Criminal Procedure 33 permits a district court to grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). A motion for a new trial based on newly discovered evidence "is committed to the sound discretion of the trial court and will not be overturned absent abuse of discretion."

*United States v. Garcia*, 13 F.3d 1464, 1472 (11th Cir. 1994). "Motions for a new trial based on newly discovered evidence are highly disfavored in the Eleventh Circuit and should be granted only with great caution." *United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006) (internal citation omitted). On such a motion, the defendant bears the burden of justifying a new trial. *Id.*

To succeed on a motion for new trial based on newly discovered evidence, the movant must establish that "(1) the evidence was discovered after trial, (2) the failure of the defendant to discover the evidence was not due to a lack of due diligence, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material to issues before the court, and (5) the evidence is such that a new trial would probably produce a different result." *United States v. Schlei*, 122 F.3d 944, 991 (11th Cir. 1997). "The failure to satisfy any one of these elements is fatal to a motion for new trial." *Id.* (quoting *United States v. Lee*, 68 F.3d 1267, 1274 (11th Cir. 1995)). Newly discovered evidence need not relate directly to the issue of guilt or innocence to justify a new trial "but may be probative of another issue of law." *Id.*

As we have noted, Chin bases his argument for a new trial on the discovery of the evidence relating to Hill's written statements.  But because Chin cannot establish the third and fifth elements, he is not entitled to a new trial.[2]

Beginning with the fifth element, a new trial would not produce a different result.  As we have explained, the evidence against Chin was substantial and came from different types of physical evidence and several witnesses.  As a result, Chin likely would have been convicted even if Hill had not testified at all.  Plus, the Government on direct examination elicited testimony from Hill about his criminal history and his desire to receive a reduced sentence, and the defense spent a large portion of its cross-examination attempting to attack Hill's credibility by reemphasizing his incentive to please the Government with his testimony—a chance to get out of jail sooner.  Hill was also unable to identify Chin as "Bless" in the courtroom.

The jury heard all of this evidence, determined Hill's credibility, weighed it against the remaining evidence, and still convicted Chin.  Hill's new letters would not have made a difference, given the enormity of the remaining evidence against Chin.  *See Garcia*, 13 F.3d at 1472 (finding new evidence would not have produced a different result where the witness was not a critical witness and another witness had provided incriminating testimony); *United States v. Lee*, 68 F.3d 1267,

---

[2] Because we find that Chin cannot establish the third and fifth elements, we do not review the remaining elements.

17

1274 (11th Cir. 1995) (new recantation evidence would not have produced a different result because the government could have used trial testimony as impeachment).

As to the third element, the new evidence was both merely impeachment evidence and cumulative. When read literally, as the district court correctly found, the letters say that Hill never saw Chin with Vaughn, but they do not say that he never saw someone by the name of "Bless" with Vaughn. This is actually consistent with Hill's testimony at trial: Hill was unable to identify Chin as "Bless." Nor do these letters show that Chin had no ties to Vaughn, just because Hill personally did not see them together.

Accordingly, this new evidence would have served only to impeach Hill. But Hill had already been impeached on multiple grounds. As a result, the new evidence would also have been cumulative. *See United States v. Diaz*, 190 F.3d 1247, 1255 (11th Cir. 1999) (newly discovered sworn statement of co-conspirator contradicting his testimony at trial was merely impeaching evidence); *United States v. Champion*, 813 F.2d 1154, 1171 (11th Cir. 1987) (new evidence was merely impeaching and cumulative where the defense had already impeached the witness at trial).

Because Chin failed to establish the third and fifth elements, the district court did not abuse its discretion in denying Chin's motion for a new trial.

18

## C. Sentencing

We review the reasonableness of a sentence for abuse of discretion, using a two-step process. *United States v. Pugh*, 515 F.3d 1179, 1190 (11th Cir. 2008). We look first at whether the district court committed any significant procedural error, such as miscalculating the advisory guidelines range, treating the guidelines as mandatory, failing to consider the 18 U.S.C. § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to explain adequately the chosen sentence. *Id.* Second, we examine whether the sentence is substantively unreasonable under the totality of the circumstances. *Id.*

Chin argues only that his sentence of 188 months' imprisonment with 60 months of supervised release is substantively unreasonable. Primarily, he contends that his sentence creates a sentencing disparity between himself and his co-defendant Vaughn, who entered a plea deal and received a sentence of 151 months of imprisonment with 60 months of supervised release. We are not persuaded.

In considering the 18 U.S.C. § 3553(a) factors, the district court should "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). "A well-founded claim of disparity, however, assumes that apples are being compared to apples." *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009) (quoting *United States v. Mateo-Espejo*, 426 F.3d 508, 514 (1st Cir. 2005)). So as an initial

19

matter, a defendant claiming substantive unreasonableness based on a sentencing disparity must establish that he is "similarly situated" to those who received lesser sentences. *Id.*

We have held that defendants like Vaughn, who cooperate with the United States and enter a plea agreement are not similarly situated to defendants like Chin, who provide no assistance to the United States and proceed to trial. *See United States v. Williams*, 526 F.3d 1312, 1323–24 (11th Cir. 2008). As we have explained,

> There is no unwarranted disparity even when the sentence the cooperating defendant receives is "substantially shorter." "On a practical level, it would seem patently unreasonable to endorse a regime in which a defendant could steadfastly withhold cooperation from the authorities and then cry foul when a coconspirator benefits from rendering substantial assistance to the government."

*Docampo*, 573 F.3d at 1101 (internal citations omitted).

Here, Chin and Vaughn were not similarly situated. Chin went to trial, while Vaughn took responsibility for his crimes by pleading guilty and received a corresponding reduction in sentencing. And even more significantly, Chin had a higher criminal-history level of V, while Vaughn's criminal-history level was III.

Finally, defense counsel specifically asked the court to adopt a base offense level of 32 and a criminal-history category of V, which led to an advisory sentencing guideline range of 188 to 235 months. Later, defense counsel requested a downward variance of 120 to 188 months and argued that if the district court

20

chose not to vary downward, then a 188-month sentence "'would result in a reasonable and not greater than necessary sentence."

The district court agreed with and adopted the initial base level offense set forth by the defense of the 188 to 235 months.  It expressly considered Chin's abusive upbringing, the negative influences from his time in prison, the love from his family, and his apology during sentencing.  And after accounting for all of those considerations, it chose to sentence Chin to the low end of the guideline range:  188 months—precisely what defense counsel agreed "'would result in a reasonable and not greater than necessary sentence.'"  We find no abuse of discretion.

## V.

For the foregoing reasons, we affirm on all issues.

**AFFIRMED.**

21